**In re GLOBAL TECHNOVATIONS, INC., et al.,[1] Debtors.**

**In re Onkyo America, Inc., Debtor.**

**Global Technovations, Inc. and Kenneth Nathan, Liquidating Agent for Onkyo America, Inc., Plaintiffs,**

**v.**

**Onkyo U.S.A. Corporation, Onkyo Europe Electronics Gmbh, Onkyo Malaysia Sdn. Bdh., Onkyo Electric (Malaysia) Sdn. Bdh., and Onkyo Corporation, Defendants.**

**Bankruptcy Nos. 02–40447, 01–64771. Adversary No. 03–5078.**

United States Bankruptcy Court, E.D. Michigan, Southern Division.

July 2, 2010.

---

1. This bankruptcy case is jointly administered with Case Nos. 02–43678 (*In re On–Site Analysis, Inc.*); 02–43680 (*In re Top Source Oil Analysis, Inc.*); 02–43682 (*In re Top Source Automotive, Inc.*); Case No. 02–43683 (*In re ARCS Safety Seat, Inc.*).

Deborah Kovsky-Apap, Robert S. Hertz-berg, Pepper Hamilton LLP, Detroit, MI, for Plaintiffs.

Donald J. Hutchinson, Detroit, MI, for Defendants.

## AMENDED TRIAL OPINION**

THOMAS J. TUCKER, Bankruptcy Judge.

In this adversary proceeding, Plaintiff Global Technovations, Inc. ("GTI") seeks

** This amended opinion amends, in minor ways, the trial opinion that was filed on June

to avoid, as a fraudulent transfer under 11 U.S.C. § 544(b) and Florida law, a $13 million payment it made and $12 million in obligations it incurred, to purchase 5,900 shares of common stock of Onkyo America, Inc. GTI purchased the stock from Defendants Onkyo Europe Electronics GMBH ("Onkyo Europe"); Onkyo Malaysia SDN. BDH. ("Onkyo Malaysia"); and Onkyo Corporation ("Onkyo Japan") (collectively "the Onkyo Defendants"). GTI also seeks the disallowance of the claims filed by the Onkyo Defendants in GTI's bankruptcy case, under 11 U.S.C. § 502(d).

The Court conducted a bench trial spread over 18 days, amounting to the equivalent of roughly 13 full days of trial time. This opinion states the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court finds for Plaintiff GTI and will, among other things, enter judgment for GTI in the amount of $6.1 million, plus interest.

## I. Introduction and background

### A. The parties and their sale transaction

The Chapter 11 Debtor Onkyo America, Inc. ("OAI") was a manufacturer and supplier of automotive speakers. On June 29, 2000, GTI as the Buyer, and the Onkyo Defendants, as the Sellers, and OAI entered into a "Share Purchase Agreement" (the "Agreement"), under which GTI agreed to purchase all of the outstanding shares of common stock (5,900 shares) of OAI from the Onkyo Defendants. The Agreement was amended by a letter agreement dated August 3, 2000. Under the Agreement as amended, GTI agreed to purchase the OAI stock for $25 million, plus up to an additional $15 million that

was contingent on an "Earn–Out Formula" set forth in the Agreement, based on OAI meeting certain future earnings thresholds.

The sale closed on August 31, 2000. At closing, GTI paid $13 million in cash, by wire transfer, to an agent of the Onkyo Defendants, for the benefit of the Onkyo Defendants. GTI also executed and delivered three promissory notes, each dated August 31, 2000 and payable in August 2003, for the $12 million balance of the $25 million portion of the purchase price. The promissory notes were: (a) a $4.2 million note payable to Onkyo Europe for its 2,065 shares of OAI stock; (b) a $4.2 million note payable to Onkyo Malaysia for its 2,065 shares of OAI stock; and (c) a $3.6 million note payable to Onkyo Japan for its 1,770 shares of OAI stock.

Soon after the closing, the financial condition of both OAI and GTI worsened. GTI negotiated with Defendant Onkyo Japan for amendments to the OAI acquisition transaction. As a result, the parties further amended the Agreement, by a letter agreement dated January 6, 2001. The amendment: (1) reduced the principal amount owing under the promissory note to Onkyo Japan by $1 million and forgave the interest that had accrued on the $1 million; (2) deferred payment of intercompany obligations OAI owed to Onkyo Japan under Section 17.01 of the Agreement, from May 31, 2001 until March 10, 2002; and (3) required GTI and OAI to execute and deliver a General Release, under which GTI and OAI released the Onkyo Defendants from claims relating to the Agreement.[2]

### B. The GTI and OAI bankruptcies

After these amendments were made to the Agreement, OAI's financial condition

30, 2010 (Docket # 224).

2. As discussed below, and by agreement of the parties, the Onkyo Defendants have waived any defense based on this release.

continued to deteriorate. In October 2001, OAI's secured lender GMAC, essentially took over the day-to-day operations of OAI, with the help of its financial advisor, BBK, Ltd.

On November 21, 2001, GTI, by its President and Chief Executive Officer, Will Willis, wrote a letter to Onkyo Japan discussing the possibility of OAI being forced into bankruptcy, and of GTI filing bankruptcy in order to set aside the OAI acquisition as a fraudulent transfer.

On December 18, 2001, GTI and its affiliates, On–Site Analysis, Inc.; Top Source Oil Analysis, Inc.; Top Source Automotive, Inc.; and ARCS Safety Seat, Inc., filed voluntary petitions for relief under Chapter 11.[3] The next day, GTI's wholly-owned subsidiary, OAI, filed a voluntary petition for relief under Chapter 11.[4]

The Onkyo Defendants each filed proofs of claim in the GTI bankruptcy case. Onkyo Europe and Onkyo Malaysia each filed a proof of claim in the amount of $4,229,891.00; and Onkyo Japan filed a proof of claim in the amount of $3,625,621.08. (PTO p. 4).[5]

On February 21, 2003, the Court entered a confirmation order that confirmed the Plan of Reorganization of GTI and its affiliated Debtors (the "GTI Plan"). Under the confirmed GTI Plan, GTI is vested with all assets of the GTI Debtors including all causes of action arising under chapter 5 of the Bankruptcy Code. (R. 5/15 pp. 4–7).[6]

## C. The claims in this adversary proceeding, and course of proceedings

After Plaintiffs GTI and Kenneth Nathan, the Liquidating Agent for OAI, filed this adversary proceeding, they filed a First Amended Complaint (Docket # 154), which contained six counts:

- Counts I and II, in which GTI seeks to avoid and recover, as fraudulent transfers, transfers GTI made and the obligations it incurred to the Onkyo Defendants and Onkyo U.S.A. as part of its acquisition of the OAI common stock;

- Counts III and IV, in which GTI and Plaintiff Kenneth Nathan, as Liquidating Agent for OAI, seek to avoid, as a fraudulent transfer, the General Release that GTI and OAI gave to the Onkyo Defendants under the 2001 amendment to the Agreement, described above;

- Count V, in which Kenneth Nathan seeks to avoid as preferences, and recover, five payments OAI made to Onkyo Electric (Malaysia) SDN. BDH.; and

- Count VI, in which GTI and Kenneth Nathan seek disallowance of the claims filed by the Onkyo Defendants and Onkyo Electric (Malaysia) SDN. BDH., based on 11 U.S.C. § 502(d), because the Onkyo Defendants and Onkyo Electric (Malaysia) SDN. BDH. allegedly possess property of the es-

---

**3.** GTI and its affiliates filed their petitions in the United States Bankruptcy Court for the District of Delaware. That court later transferred those cases to this court.

**4.** Case No. 01–64771.

**5.** In this opinion, facts stipulated to by the parties in the Second Revised Joint Final Pre-Trial Order (Docket # 157, the "PTO") will be cited as (PTO p. # ).

**6.** In this opinion, citations to the official trial transcript will appear as (R. month/date page # ). Citations to those transcript portions stipulated to as official by the parties (see Docket ## 211, 212) will appear as (SR. month/date page # ). Citations to trial exhibits will appear as (TX trial exhibit # ).

tates of GTI and OAI that can be recovered under 11 U.S.C. § 550, and are "transferee[s] of a transfer avoidable under section 544 of the Bankruptcy Code."

Plaintiff Nathan and Defendants Onkyo U.S.A. Corporation and Onkyo Electric (Malaysia) SDN. BDH. are no longer parties to this action. On April 1, 2006, the Court granted summary judgment for Onkyo USA Corporation on all claims against it (Docket # 150). On April 7, 2006, the Court entered a stipulated order (Docket # 168), which dismissed Counts III and IV of the complaint as between Nathan and Onkyo Electric (Malaysia) SDN. BDH., which were related to the General Release given by GTI and OAI. That stipulated order also provided that the General Release could not be asserted as a defense to Counts I and II. As a result of these orders, only Counts I, II, and VI between Plaintiff GTI and the three Onkyo Defendants remain.

Before trial, the Onkyo Defendants filed a motion to dismiss the claims against them and for monetary sanctions, based on GTI's alleged spoliation of evidence. The motion alleged that "[m]ost of the documents relevant and material to this lawsuit were lost or destroyed while in the exclusive control of the [P]laintiffs."[7] The motion claimed that the loss of these documents prejudices the Onkyo Defendants and "undercuts the Onkyo Defendants' ability to defend this action."[8] Alternatively, the motion argued, if the case is not dismissed, Defendants are entitled to the following evidentiary presumptions at trial: "that (1) the [so-called] GTI Acquisition

Model reflects the reasonable expectations and projections of the Plaintiffs at the time of the acquisition; and (2) that the destroyed and/or missing documents would be detrimental to the plaintiffs' claims."[9] The Court held a hearing, and denied the motion without prejudice to Defendants' right to request such relief as part of their defense at trial.[10]

Trial was held, and Defendants renewed their spoliation motion. After the trial concluded, the parties filed several statements of post-trial supplemental authority,[11] and supplemental briefs on the spoliation issues,[12] all of which the Court has considered, along with the rest of the record, in making its decision.

## II. Jurisdiction and venue

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D.Mich.). Counts I and II of GTI's First Amended Complaint seek to avoid a fraudulent transfer and fraudulent obligations under the combination of 11 U.S.C. § 544(b)(1) and Florida fraudulent transfer statutes. As such, these claims are core proceedings under 28 U.S.C. § 157(b)(2)(H). *See Bliss Technologies, Inc. v. HMI Industries, Inc. (In re Bliss Technologies, Inc.)*, 307 B.R. 598, 603–06 (Bankr.E.D.Mich.2004). Count VI of GTI's First Amended Complaint seeks disallowance of Defendants' claims filed in the GTI bankruptcy case, based on 11 U.S.C. § 502(d). As such, this claim is a core proceeding under 28 U.S.C. § 157(b)(2)(B).[13]

---

7. Mot. to Dismiss (Docket # 40) at 2 ¶ 4.

8. *Id.* at 3 ¶ 8.

9. *Id.* at 3 ¶ 10.

10. Order (Docket # 145).

11. Docket ## 213–216.

12. *See* Docket ## 217–222.

13. "[A] bankruptcy court 'must examine each cause of action separately to determine if it is core or non-core.'" *Bliss Technologies, Inc.,* 307 B.R. at 602 (citations omitted).

Venue is proper under 28 U.S.C. § 1409(a), and is not disputed.

## III. Facts[14]

The Court finds the following facts, and the facts stated elsewhere in this opinion, all based on a review of all of the evidence presented at trial—*i.e.*, all of the testimony and exhibits admitted into evidence—and the Court's assessment of the credibility and reliability of the witnesses and of their testimony.[15]

### A. Parties

#### 1. GTI

GTI is a Delaware Corporation with its principal place of business in Palm Beach Gardens, Florida. Before filing bankruptcy, GTI was publicly traded on the American Stock Exchange. (SR. 4/11 p. 129).

Historically, GTI's operations were divided into two main components: its On–Site Oil Analyzer business ("OSA"); and its Top Source Automotive business ("TSA"). (SR. 4/11 p. 46).

GTI's OSA is an on-site motor oil diagnostic and preventative maintenance program used to diagnose the condition of vehicles and prescribe necessary corrective actions. It is often described as a blood test for engines. (SR. 4/11 pp. 46–47; TX 109). The primary customers for the OSA technology are companies in the automotive or engine maintenance business.

Since its inception, the OSA business has required large cash outlays to develop and manufacture the OSA technology, and to develop a market for the OSA. (SR. 4/11 pp. 73–74).

On the other side of its business, GTI's wholly-owned subsidiary, TSA, produced an audio speaker "sound bar" for Chrysler's Jeep Wrangler products. The sound bar is an overhead mounted speaker system installed in the Wrangler. (SR. 4/11 pp. 46–47). While TSA was a profitable division, its only contract was for the Jeep Wrangler sound bar and that contract had only a few years remaining, with sales quantities expected to decline as expiration of the contract approached. (SR. 4/11 p. 47).

By late 1999, as a result of its continuing attempts to develop and build recognition for its unique OSA product, GTI was a cash poor company. Therefore, through its CEO, Will Willis, and CFO, David Natan, GTI made the strategic decision to sell its profitable subsidiary, TSA. (SR. 4/11 p. 48). In late 1999, GTI sold TSA to Onkyo America, Inc. ("OAI") for $9 million in cash and $1 million in OAI preferred stock.

The purchase of TSA provided OAI with a current vendor number and relationship with Chrysler, an automobile manufacturer that had previously ceased doing business with OAI. (R. 5/16 p. 62; R. 5/22 p. 34; R. 5/2 p. 13).

---

**14.** After the close of evidence and before closing arguments at trial, the parties filed extensive proposed findings of fact and conclusions of law (Docket ## 206, 208), and trial briefs. The Court acknowledges that in places, this opinion draws heavily from the parties' proposed findings and conclusions. This is done, in part, because of the complexity and detail involved in this case, and in part, because the proposed findings and conclusions by the parties are extremely well done, on both sides. The Court has modified many of the proposed findings and conclusions that it has used.

And, of course, the Court has exercised careful and independent review of the evidence, arguments, and the law, to determine all of the facts and conclusions stated in this opinion.

**15.** Because of the length of the trial and the voluminous nature of the record, the Court cannot discuss all of the evidence in this opinion. Nor is it necessary to do so in order for the Court to reach and explain its decision.

## 2. OAI

In 2000, OAI was an Indiana corporation with its principal place of business in Columbus, Indiana. OAI was founded in 1987 (TX 158). By 2000, OAI had grown to approximately 400 employees (TR 5/16 p. 58) and had operations in both Columbus, Indiana, and Troy, Michigan (TX 122 at GMAC 3571).

OAI's primary business was supplying automotive audio speakers to original equipment manufacturers ("OEMs") in the United States. A substantial majority of OAI's business (approximately 85%–90%) came from its supply of speaker parts to Tier 1 automotive suppliers, and of that, approximately 55% was to a single customer, Delco/Delphi Electronics ("Delphi"), which purchased parts from OAI for supply to the ultimate customer of those parts, General Motors. (R. 5/16 p. 58; R. 4/17 p. 58; SR. 4/25 p. 946; R. 5/9 p. 5; SR. 4/11 p. 261).

OAI's Columbus manufacturing facility was approximately 130,000 square feet (TX 250) located on approximately 25 acres (TX 122) and had the capacity to produce over one million speakers per month (TX 250). Its major customers included Delphi, Toyota, General Motors ("GM"), DaimlerChrysler, and Nissan (TX 438). OAI was one of the top two producers of automotive speakers in the United States (TX 413).

Historically, OAI had a good reputation for quality and service (TR 5/23 p. 63). In the first quarter of 2000, for example, OAI was ranked as the best speaker supplier to Delphi in terms of quality, timeliness, responsiveness, and customer satisfaction (TX 112; *see also* TX 241).

In the years leading up to GTI's acquisition of OAI, OAI's business had begun to decline. OAI's performance from January 1, 1997 through August 31, 2000 showed significant downward trends in sales, gross margins, and EBITDA.[16] (R. 5/23 pp. 10, 25; R. 5/2 p. 191). Specifically, OAI's annual revenues from business originally generated by OAI, and not through acquisition, decreased from $73.9 million in 1996 to $72.4 million in 1999, and OAI only achieved $66.1 million for the trailing twelve month ("TTM") period ended August 31, 2000. Similarly, OAI's gross margin percentage declined from 15.6% in 1997 to 13.9% in 1999, and OAI only achieved an 11% annualized gross margin as of August 2000. (R. 5/2 pp. 201–02).

As demonstrated by automotive industry analyst resources, OAI's declining revenues occurred at the same time the automotive industry was experiencing record production and when companies comparable to OAI were enjoying large revenue growth. (R. 5/2 pp. 216–17).

As a result of its declining revenues in the automotive sector, OAI began considering an expansion of its speaker business into other market sectors such as non-automotive and aftermarket. (R. 5/22 p. 33). However, OAI had a demonstrated historical inability to grow business in these additional sectors. Specifically, OAI's revenues in the non-automotive sector from 1995 to the TTM period ended August 31, 2000 showed a marked decline. (R. 5/2 pp. 196–201). And OAI's revenues in the aftermarket speaker sector from 1997 through 2000 consistently remained a negligible component of OAI's total business. (*Id.*).

### (a) The Toolbox program

In 1997, GM selected OAI to supply approximately 25% of GM's speakers under a new program called "Toolbox." The Toolbox program was created by GM as an

---

**16.** Earnings before interest, taxes, depreciation, and amortization ("EBITDA").

effort to streamline its suppliers (TR 5/16 pp. 152–54), who would supply standardized speakers in uniform sizes (TX 239; TX 240; TR 5/16 p. 153). When one of OAI's competitors, International Jensen, went bankrupt in 1998, OAI bid for and was awarded Jensen's share of the Toolbox program (TR 5/16 pp. 156–57, 195–96). OAI hoped to produce approximately 50% of all speakers for all GM cars, when the Toolbox program began (*id.* pp. 156–57). The Toolbox program would have elevated OAI from a "Tier Two" (indirect) supplier to GM to a "Tier One" (direct) supplier.

OAI originally expected to begin Toolbox production in 2000 or 2001 (TR 5/16 p. 158). But that start date was later delayed until approximately 2003 (*id.* pp. 158–59).

### (b) "Branded" audio systems

In 2000, OAI was also pursuing sales of auto audio systems carrying the Onkyo brand name ("branded" systems). Such "branded" opportunities had higher expected profit margins than OAI's traditional auto business (TR 5/1 p. 124).

OAI was awarded a branded program for Corvettes in 1999 or 2000 (TR 5/16 p. 198). Another branded opportunity for OAI in 2000 was the GM–390 program for Pontiac (TR 5/1 pp. 123–25). Quotes and negotiations for that business began during 2000 near the time of the acquisition (*id.* pp. 124–25).

### (c) Aftermarket and non-automotive business

By August 2000, OAI had obtained some specific, but limited, new aftermarket and non-automotive business (TR 5/1 p. 108). Such aftermarket and non-automotive sales had higher profit margins than OAI's traditional automotive business (TR 5/1 pp. 98–99).

The lead time for generating new sales of aftermarket and consumer speakers was shorter than the typical process of sales to the automotive OEMs (TR 5/1 pp. 108–09). Development of the aftermarket business would diversify OAI's customer base (TR 5/16 p. 161).

One example of new aftermarket and non-automotive business at OAI was the Pyle contract (TX 251). Pyle was a manufacturer of speakers that planned to cease operations during the third quarter of 2000. (*Id.*). OAI negotiated with Pyle, and received a contract to purchase Pyle's inventory and assume Pyle's customer base, including J.L. Audio. (*Id.;* TR 5/1 pp. 115–117, 28–29). Less than two weeks after the acquisition, Willis described Pyle as OAI's "best, short-term opportunity" (TX 404).

But OAI's acquisition of Pyle's assets did not assure that OAI would successfully obtain contracts with Pyle's individual customers, most of whom had already found new suppliers. (R. 5/16 p. 116; R. 5/2 pp. 200–01; TX 252). Moreover, the value of this potential business was projected by Steve Gramig, an OAI sales manager responsible for aftermarket sales, to be only $500,000. (R. 5/2 p. 200).

OAI also hoped for additional new business from automotive and non-automotive customers including Clarion Marine, TCSounds, and Klipsch (TX 250).

Before GTI's acquisition of OAI, OAI had obtained some new business with Clarion Marine, Nissan, and J.L. Audio and other customers of Pyle (TR 5/16 pp. 77–81). And OAI supplied some aftermarket parts (subwoofers) to J.L. Audio after the acquisition (TR 5/1 pp. 112–13). But post-acquisition quality problems resulted in lost J.L. Audio business (*id.* pp. 113–15).

### 3. The Onkyo Defendants

At the time of its acquisition by GTI in August 2000, 100% of the outstanding common stock of OAI was owned by the Onkyo Defendants as follows: (a) 2,065 shares by Onkyo Europe, (b) 2,065 shares by Onkyo Malaysia, and (c) 1,770 by Onkyo Japan. (TXs 55, 302).

Onkyo Japan, which was principally owned and controlled by its Chairman and CEO, Naoto Otsuki, also owned all of Onkyo Europe and Onkyo Malaysia. (R. 5/16 pp. 16–17).

OAI, like each of the Onkyo subsidiaries, was required to stay in close contact and make periodic reports to the parent company, Onkyo Japan. These reports included sending OAI's budgets and monthly financial results to executives who reported directly to Chairman Otsuki in Japan, for their review and consolidation. (R. 5/16 pp. 39–40; R. 5/2 pp. 27–28; R. 5/16 p. 39). Throughout year 2000, OAI was required to send monthly financial reports to, among other Onkyo Japan executives, Chairman Otsuki directly and Yasunori Hiruma, who acted in the capacity of Onkyo Japan's CFO. (R. 5/2 p. 72; TXs 321, 324, 325).

Onkyo Japan also played an active role in selecting the managing officers of OAI. Traditionally, the position of president at OAI had been occupied by an American, Charles Limberg. (R. 5/16 p. 25). However, in 1999, when revenues and profits declined, Chairman Otsuki personally selected Shinobu Shimojima to replace Mr. Limberg as president of OAI. At the time, Shimojima had no experience managing automotive, speaker/electronic or manufacturing companies. (SR. 4/25 p. 965; R. 5/2 pp. 45–46, 56; R. 5/23 p. 11).

At the time Shimojima came to OAI, he was personal friends with Chairman Otsuki, was one of the shareholders of Onkyo Japan, and Shimojima had served as a member of Onkyo Japan's board of directors since approximately 1995. (R. 5/2 p. 51; R. 5/22 p. 32).

OAI's CFO, Doug Pillow, who had served as such for over 10 years, made regular contact with Chairman Otsuki and other Onkyo Japan executives. (R. 5/2 pp. 7, 25–26). He served together with Mr. Shimojima as an intermediary and agent of the Onkyo Defendants, and Chairman Otsuki in particular, for purposes of negotiating with GTI for its purchase of OAI. (SR. 4/11 pp. 77, 85; R. 4/24 p. 52).

### B. The OAI Acquisition

### 1. The Onkyo Defendants' prior attempts to sell OAI

In the latter part of the 1990's, before GTI's acquisition of OAI, Chairman Otsuki began to consider the possibility of taking his company, Onkyo Japan, public. However, to become a public company, Onkyo Japan first had to utilize its then-existing $28 million tax loss carryforward. (SR. 4/11 pp. 121–22; TX 156). To accomplish this, Chairman Otsuki began trying to sell OAI in order to realize a gain that could be offset by Onkyo's loss carryforward. (*Id.*).

The Onkyo Defendants' first two attempts to sell OAI were in the form of proposed management buy-outs ("MBOs"). The first MBO attempt occurred in 1997 and was led by OAI's then president, Chuck Limberg. Management intended to finance the MBO by investing their own money and borrowing additional funds (TR 5/16 p. 59). The total purchase price was to be approximately $40 million (*id.*). During this attempted MBO, Mr. Limberg and the other participating managers solicited the assistance of multiple investment banks. However, they were unable to find a lender willing to provide financing, and the MBO failed. (R. 5/16 pp. 59–60).

The second proposed MBO occurred in late 1999 under the leadership of President Shimojima. (R. 5/16 p. 61). This time, Mr. Shimojima and the participating managers solicited the assistance of Will Willis, whom Mr. Shimojima had worked with and came to trust during OAI's purchase of TSA, to help find financing for the second MBO. (SR. 4/11 pp. 55–57). Pillow and Gramig participated in that second MBO, along with OAI's new President Shinobu Shimojima (*id.;* TR 5/22 pp. 37–41).

Shimojima, Pillow, and Gramig intended to purchase OAI from Onkyo for $40–45 million (TR 5/22 p. 37). They planned to finance the MBO through a combination of approximately $2 million of their personal funds plus outside financing (*id.*) They continued to explore the possibility of an MBO into 2000. But despite the assistance of Mr. Willis, this second management team was also unable to find any entity willing to finance an MBO acquisition of OAI. (SR. 4/11 p. 23; R. 5/16 p. 61).

The Onkyo Defendants attempted to sell OAI a third time at substantially the same time as the second MBO attempt. During this time, the Onkyo Defendants entered into negotiations with Fred Klipsch, the owner of another speaker manufacturing company. After preliminary discussions, Mr. Klipsch likewise declined to participate in the proposed purchase of OAI. (SR. 4/11 p. 75; R. 5/1 p. 22; R. 5/22 p. 45).

### 2. Proposed sale of OAI to GTI

In early 2000, after the first three failed attempts to dispose of OAI, and on behalf of Chairman Otsuki and the Onkyo Defendants, Shimojima and Pillow arranged a meeting with Willis in Florida to discuss a proposal to sell OAI to GTI. (SR. 4/11 pp. 75, 77).

Given that GTI had recently sold TSA, and represented to the investment community in which GTI was publicly traded that it wanted to get out of the automotive supply business, Willis initially was not interested in purchasing OAI. (SR. 4/11 pp. 75–76). However, Shimojima and Pillow represented to Willis that OAI was a strong company with excess annual cash flows. Specifically, Shimojima and Pillow told Willis that OAI generated approximately $6.9 million in excess cash each year. (SR. 4/11 p. 77).

At the same time the Onkyo Defendants were telling Willis about OAI's large cash flows, GTI was in the midst of an escalating cash crisis. The developing OSA business was continuing to consume cash, and the cash generated from GTI's prior sale of TSA was nearly exhausted. Further complicating GTI's cash position were the facts that GTI's primary investor, The Mennen Family Trust, was refusing to invest any more money in the company, and that GTI's outside consultant, retained to locate additional investors in GTI, was having difficulty locating any investor willing to provide GTI with the additional working capital it needed to survive. (SR. 4/11 pp. 73–75).

In light of GTI's escalating cash crisis and its inability to raise new funds, the company was in imminent danger of being de-listed by AMEX, where its shares were traded. Delisting would have dealt a serious blow to GTI and its operations. (R. 4/24 pp. 48–50; SR. 4/11 pp. 154–55; TXs 163, 260).

Given its need for an infusion of cash to sustain operations, Willis viewed the acquisition of OAI, and the excess cash flows OAI was represented to have, as a pragmatic option for acquiring a continuing source of cash to support GTI and its developing OSA business. (R. 4/24 pp. 50–51; SR. 4/11 p. 76; TX 156).

### 3. Initial Negotiations and Due Diligence

GTI's initial negotiations with the Onkyo Defendants for the purchase of OAI were

conducted between Willis and Shimojima, who represented to Willis that he spoke with Chairman Otsuki daily concerning the proposed sale. (SR. 4/11 p. 77).

GTI sent the Onkyo Defendants a draft Letter of Intent for the purchase of OAI on March 14, 2000. (SR. 4/11 pp. 82–85; TX 242). Under the Letter of Intent, which was ultimately executed on March 30, 2000, it was agreed that GTI would purchase OAI for $28 million cash plus a $12 million earn-out provision that would require GTI to make additional payments to the Onkyo Defendants upon the achievement of certain EBITDA targets. (TX 158). The Letter of Intent also prohibited Onkyo from negotiating with any other entity for the sale of OAI (TR 4/18 pp. 90–91).

At the time of the Letter of Intent, Willis had no intention to pay $28 million cash (TR 4/18 pp. 94–95). In a March 17, 2000 memo to GTI's Board of Directors, Willis reported, "Our strategy is to get the [Letter of Intent] signed, have them terminate talks with other acquirers, do extensive due diligence, then re-negotiate the deal based on [a] 'material change' in performance" (TX 288; TR 4/18 pp. 94–95).

By April 2000, GTI had actively begun conducting its initial due diligence on OAI. The primary participants on the GTI due diligence team were Will Willis, GTI's CFO David Natan, GTI's Controller David Obernesser, and Michele Brant, a GTI staff accountant. (SR. 4/11 p. 85). Because OAI was a private company at the time of the sale, there was no public information available. Therefore, GTI's due diligence team was forced to rely more heavily on the representations and documentation provided by Pillow and Shimojima, the designated contacts at OAI for GTI's due diligence requests. (SR. 4/11 p. 85; R. 4/24 p. 52; R. 5/16 pp. 21, 64).

### 4. Key factors in GTI's evaluation of the OAI purchase

During its due diligence and evaluation of OAI, GTI primarily focused on OAI's earnings and profitability. GTI analyzed OAI's trailing twelve-month EBITDA ("TTM EBITDA"), and OAI's future sales prospects, as the salient measures of OAI's value, earnings and profitability. (R. 4/24 pp. 69–70; SR. 4/11 pp. 195–96).

To document, summarize and evaluate the due diligence information provided by the Onkyo Defendants, including OAI's historical and projected EBITDA based on future expected sales, GTI's David Natan created a series of spreadsheets known as the GTI Acquisition Model ("GAM"). (R. 4/24 pp. 69–70; TX 30). The GAM, while created in form by Mr. Natan, was based on financial information and inputs provided directly by OAI, and more specifically, Pillow and Shimojima. (R. 4/24 pp. 52, 72, 99; TXs 227, 245). It was created to allow OAI's most recent monthly financial performance to be plugged into the GAM to create an up-to-the-minute picture of OAI's TTM EBITDA, on a rolling basis. (R. 4/24 p. 68).

Most of the sales and financial data that was used to develop the GAM was provided by Pillow and Shimojima, and came in the form of the OAI Budget Roll–Up, a detailed document created by OAI that described, among other things, the company's future sales projections. (SR. 4/11 pp. 93–94; R. 4/24 pp. 53–55; TXs 227, 245). The OAI Budget Roll–Up contained schedules and spreadsheets of sales and cost data that were prepared by OAI. (R. 5/16 pp. 112–15). The Budget Roll–Up did not contain any sales contracts, purchase orders, or any other back-up information from OAI's customers or vendors. (R. 4/24 pp. 66–67).

Shimojima and Pillow permitted GTI's due diligence team to review the Budget Roll–Up at OAI's headquarters in Columbus, IN, but GTI was not permitted to photocopy or remove the Budget Roll–Up. Rather, only a few select schedules from the Budget Roll–Up were ever permitted to be photocopied in hard copy form by GTI. (R. 4/24 pp. 53–54).

Natan testified that the GAM was originally based on OAI's projections, and that he reduced OAI's budgeted figures by a total of between five and ten percent (TR 4/24 pp. 73–74). However, except for five pages of automotive sales projections that Natan testified were created by OAI (TR 4/24 p. 55), the original OAI projections and underlying support Natan reviewed are no longer available.

As evidenced by various versions of the GAM admitted into evidence, GTI relied on OAI's projected TTM EBITDA of $6.8 million for the period ended August 31, 2000 in evaluating the purchase of and value of OAI. (R. 4/24 p. 96; TX 257).

For projected OAI sales volumes after the closing date, the versions of the GAM in evidence reveal that notwithstanding a 5–10% reduction that GTI's Natan made to the OAI sales forecasts provided by Pillow and Shimojima, GTI was relying on OAI's projections for large increases in OAI's automotive, non-automotive, and aftermarket business sectors. (R. 4/24 pp. 73–74; SR. 4/1 pp. 93–94; TXs 227, 257, 439).

While the GTI due diligence team made every effort to verify the information provided by OAI concerning sales projections, it faced two major problems: (1) explicit sales contracts do not often exist in the automotive industry; and (2) OAI's customers were public companies reluctant to release detailed information. (R. 4/18 p. 101; R. 4/24 p. 52). This lack of access to information placed a premium on the reliability of the information provided by OAI.

### 5. GTI agrees to purchase OAI

Following the strategy he outlined to GTI's Board, Willis used information obtained during the due diligence process to renegotiate the price. For example, Willis wrote a memo in June 2000 (TR 4/18 p. 126) to Doug Pillow discussing potential "concessions on the deal structure." Willis stated that the "support rationale" for these concessions included labor cost increases, "a high probability that the TSA contract will be lost sometime in the future," "current[ ] OEM volume softness," and "trailing 12 month EBITDA ... substantially below plan." Willis also noted that the "business potential [for OAI] is heavily skewed toward future acquisitions and attainment of future contracts ... [the Onkyo Defendants] are getting paid on the value we will create." (TX 168).

The purchase price and terms were revised on June 1, 2000, when GTI and Onkyo signed an "Agreement in Principle," which reduced the purchase price to $25 million, which included $17 million cash and $8 million in promissory notes, plus a $15 million "earn-out" formula (TX 169; SR. 4/11 p. 122; TX 169). The $15 million earn-out provision, like the similar provision contained in the Letter of Intent, required GTI to make additional payments to the Onkyo Defendants upon the achievement of certain EBITDA targets.

On June 29, 2000, the parties executed the Share Purchase Agreement under the same terms described in the Agreement in Principle. (SR. 4/11 pp. 127–28; PTO p. 5; TX 302).

### 6. GTI's exploration of financing alternatives

As GTI's due diligence moved forward, GTI contacted multiple lenders to solicit proposals for financing the acquisition, and

for obtaining a line of credit that OAI would need for operations going-forward. Those lenders included LaSalle Bank, Harris Bank, Provident Bank and GMAC Structured Finance ("GMAC"). (SR. 4/11 pp. 111–12; TX 161).

Several of these lenders expressed an initial degree of interest in financing the proposed acquisition and several provided GTI with non-binding term sheets. (TXs 159, 242, 247, 290). Initially, LaSalle Bank, which had been OAI's bank and its primary lender prior to GTI's purchase, appeared to be the leading contender. (SR. 4/11 p. 112; TX 247).

As GTI was discussing financing alternatives with potential lenders, it continued to perform its due diligence and continued to review OAI's most recent actual results as they became available. GTI provided its potential lending sources with OAI's updated results and revised TTM EBITDA as well. (SR. 4/11 pp. 115–116; R. 4/24 p. 51).

In the first half of 2000, OAI's actual financial results continued to decline. (SR. 4/11 p. 115; R. 5/23 p. 257). Its revenues and the resulting TTM EBITDA figures continued to come in well below budget for each month of 2000.

In light of OAI's continually deteriorating performance, lenders that had expressed initial interest in financing the acquisition either backed out and refused to provide financing, or offered financing only on terms so unfavorable to GTI that the financing was impossible for OAI to qualify for, or to accept as workable. (SR. 4/11 pp. 133–38; TXs 247, 260). Negotiations for financing continued with just LaSalle Bank and GMAC. (SR. 4/11 p. 138).

### 7. GTI secures financing with GMAC

Following execution of the Share Purchase Agreement, GTI was still having difficulty obtaining suitable financing.

LaSalle Bank, OAI's lender prior to the acquisition by GTI, made clear in July 2000 that it would be unwilling to finance the acquisition on any terms that GTI could feasibly accept. (R. 5/2 p. 98; TXs 173, 247, 261).

At about this same time, Chairman Otsuki informed GTI that if the acquisition did not close by August 31, 2000, the Onkyo Defendants would walk away from the deal, thus increasing the pressure on GTI to secure financing quickly. (SR. 4/11 p. 138; TX 113).

By this time, GMAC was the only lender left that was willing to participate, but it was only willing to do so on a limited basis. GMAC offered to provide a portion of the acquisition financing and the revolving line of credit, but only on the condition that GTI secure a secondary, subordinated lender for the remaining amounts required to purchase OAI. (SR. 4/11 pp. 151–54; R. 5/9 p. 185; TXs 176, 301).

Thus, in order to close the OAI acquisition, GTI needed to locate a subordinated second lender quickly. That lender became the Mennen Trust, which agreed to loan $12 million in the form of bridge financing that was to be replaced by alternative financing OAI would obtain shortly after the closing. (SR. 4/11 pp. 113, 153).

### 8. Third-party due diligence

In addition to GTI, due diligence on GTI's acquisition of OAI was conducted by potential lenders, including LaSalle Bank. William Lutes, then a commercial lender and later a Senior Vice President of LaSalle, testified that during its due diligence, LaSalle reviewed OAI's current and projected financial statements as well as projected cost savings. (R. 5/2 p. 102). Lutes testified that based on its review, LaSalle struggled to get comfortable with

OAI's EBITDA and cost savings projections. (R. 5/2 pp. 102–03).

Due in part to LaSalle's refusal to accept OAI's projected cost savings, GTI hired Deloitte & Touche ("D & T") to evaluate each of the cost savings measures that OAI management had represented would benefit OAI after the acquisition. (R. 5/2 p. 103; TX 80). D & T's Greg Coy testified that D & T's analysis did not, and could not, include any analysis of the feasibility of actually implementing the cost savings measures. (R. 5/2 pp. 126–29; TX 93). Indeed, D & T spent only approximately 20 hours performing very specific and limited, agreed-upon procedures. (R. 5/2 pp. 108, 111; TX 92). D & T's analysis simply assumed the proposed cost saving measures were viable, and confirmed the mathematical accuracy of the projected impact of the cost savings on OAI's financial statements. (R. 4/18 pp. 232–33; TX 93).

GMAC also performed due diligence on OAI prior to the acquisition. Like GTI, GMAC received current and projected financial information directly from OAI management. GMAC's underwriting documents show that the bank only had actual sales detail for 1998 and 1999. Thus, for the TTM ended August 31, 2000, Michael Molenda testified, GMAC relied on the sales projections provided by OAI. (R. 5/9 p. 271; TX 122). The representations made by OAI management led GMAC to believe that OAI's TTM adjusted EBITDA as of August 31, 2000 would be approximately $9 million.[17] (R. 5/9 p. 208).

Finally, due diligence was also performed by Duff & Phelps, LLC ("D & P"), which was hired at the request of GMAC to provide an opinion as to the solvency and capitalization of OAI following its pro-

posed acquisition by GTI. (TX 76). While D & P opined that OAI would be solvent, it expressly conditioned its opinion on the "accuracy and completeness" of the information provided by OAI management. (R. 5/9 pp. 51–52; TX 181). In fact, D & P placed complete reliance on current and projected financial information for OAI provided by Pillow the same information that was provided to GTI and GMAC during their due diligence. (R. 5/2 pp. 14, 16–17; R. 5/9 pp. 51–52; TXs 76, 181). D & P's opinion states that it took no steps to "independently verify the information obtained from [OAI] management...." (TX 181).

Beyond those external financial experts, all parties were represented by legal counsel during the due diligence and negotiation process (see SR 4/11 p. 165). OAI was represented by Ice, Miller, Donadio & Ryan from Indianapolis (TX 301 at OC0 2293). GTI was represented by Michael Harris, P.A., from West Palm Beach, Florida (id. at OC0 2292). The Onkyo Defendants were represented by Sullivan & Cromwell and Akai Law Offices from Tokyo (id. at OC0 2291).

### 9. The acquisition of OAI closes

On August 3, 2000, after further negotiations, the Share Purchase Agreement was amended. Under the agreement as amended, GTI agreed to pay Onkyo Japan, Onkyo Europe, and Onkyo Malaysia $25 million for their OAI stock, payable as follows: (a) $13,000,000 paid in cash at the closing; and (b) $12 million in promissory notes. (PTO p. 5; TX 302).

The OAI acquisition closed on August 31, 2000 (PTO p. 5). At the time of the

---

17. As testified by GMAC's Michael Molenda, had GMAC's due diligence showed that OAI's TTM EBITDA was in fact only $4 million, the deal would not have met GMAC's lending guidelines, Mr. Molenda would not have recommended the loan, and GMAC would not have made the loan. (R. 5/9 p. 227).

closing, and under instructions from Onkyo Japan, Onkyo Europe and Onkyo Malaysia, GTI transferred $13 million in cash via wire transfer from its bank account to an Onkyo U.S.A. Corporation ("Onkyo U.S.A.") bank account in New York, for the benefit of Onkyo Japan, Onkyo Europe, and Onkyo Malaysia. (*Id.*).

At the time of the closing, GTI also executed and delivered three promissory notes, dated August 31, 2000, to the Defendants with a total face value of $12 million as follows: (a) a $4.2 million promissory note in favor of Onkyo Europe, payable in August 2003; (b) a $4.2 million promissory note in favor of Onkyo Malaysia, payable in August 2003; and (c) a $3.6 million promissory note in favor of Onkyo Japan, payable in August 2003. (PTO pp. 5–6).

## C. The financing of the acquisition

GTI used three sources of debt to fund the acquisition and refinance certain debts of OAI to LaSalle Bank. First, GTI relied on $12 million provided by the Mennen Trust to GTI ($5 million) and OAI ($7 million) (TX 153; TX 280). The Trust committed to fund its $5 million loan to GTI for working capital purposes regardless of whether the GTI–OAI acquisition was consummated (TX 283; TX 65).

The Trust's promissory notes to GTI and OAI bore interest at 15% per year (TX 153; TX 280), which Mennen testified was a market rate given the associated risk and the Trust's secured but subordinated status (TR 5/23 pp. 170–72).

Second, GTI funded the acquisition through loans from GMAC (TX 150). As discussed above, GMAC agreed in August 2000 to loan money for the acquisition and provide a revolving loan for OAI financing (*id.*).

Third, GTI funded the acquisition through the $12 million in sellers' notes

issued by GTI to Onkyo at the time of the acquisition. Those three-year notes earned 7.5% interest rate per year (TX 304; TX 52; TX 301).

As of the closing, GTI, OAI, and the Onkyo Defendants executed the Distribution and Technical Services Agreement ("DTSA") (TX 301 at OC0 2533). The DTSA provided exclusive United States distributorship rights to OAI for all automotive speakers, office equipment speakers, television speakers, cellular or telephone speakers, home audio products or home theater systems produced by any Onkyo subsidiary. It also gave OAI access to Onkyo patents, technologies, and technical assistance (*see* TR 4/18 pp. 102–03).

## D. GTI hoped for direct and indirect benefits from the acquisition

In addition to the OAI acquisition, GTI hoped to make other acquisitions. Gramig testified that "Willis had come up with the idea [during the second MBO attempt] that if we could take [OAI] public, we could really build an empire." (TR 5/16 pp. 163–64). GTI hoped eventually to create an automotive supplier conglomerate by purchasing other, diverse auto suppliers and non-automotive companies (*id.*). As GTI stated in its March 31, 2000 "Financing Memorandum" (TX 158), "Once Onkyo is acquired and assimilated into GTI, the company will aggressively pursue complementary acquisitions or strategic alliances to further exploit and accelerate business growth/expansion." (*See* also TX 392).

At the time of the acquisition, specific cost savings had been identified and examined that GTI hoped would improve OAI's profitability (TX 93). Some of those cuts, like reducing OAI personnel, were specifically linked to the acquisition (*id.*). In addition, GTI intended to shift production

of its OSA–II products to OAI's facilities in Indiana (TR 4/18 p. 63).

GTI hoped that this move would result in "significant overhead and factory absorption cost reductions" at the GTI level (TX 158 at GTI 362).

GTI also hoped that the purchase of OAI would improve its OSA business. In an October 23, 2000 interview with the Wall Street Transcript (TX 332), Willis stated that the acquisition "enhances our credibility with the multi-million dollar companies that we are talking to regarding our on-site analyzer technology." GTI also hoped that "OAI's relationships [could] be leveraged by GTI to accelerate OEM acceptance of GTI's core OSA II technology as well as its ARC safety belt technology and other technologies that are currently under construction." (TX 109).

In the Wall Street Transcript interview, Willis stated that "[t]he Onkyo acquisition was purely a strategic move. There was an attempt to diversify our product line offering to reduce our dependence on this new emerging technology[, OSA]. It was to provide us with some critical mass and size and a platform for which to create real shareholder value." (TX 332; see also TX 406 (GTI's April 10, 2000 press release announcing the Letter of Intent stated: "we envision potential manufacturing, marketing, sales and distribution synergies" post-acquisition)).

In addition, the OAI acquisition enabled GTI to maintain the listing of its stock on the AMEX, at least for a time (TR 4/18 p. 63).

### E. GTI's post-acquisition discoveries concerning OAI

Almost immediately after its acquisition of OAI, GTI began discovering a number of problems, many of which directly impacted OAI's TTM EBITDA that had been so important to GTI's decision and ability to purchase OAI. (SR. 4/11 pp. 195–99; R. 4/24 p. 103; TXs 295, 297, 305).

### 1. Accounting errors affecting OAI's TTM EBITDA

Shortly after the closing, GTI discovered that the financial statements of OAI required adjustments, due to several accounting errors and adjustments that negatively impacted OAI's annual EBITDA at the time of closing by approximately $2 million. (SR. 4/11 pp. 198–99; TXs 207, 295, 297). These adjustments resulted in an approximate 29% decrease in OAI's August 31, 2000 TTM EBITDA, and included, among others, a $649,000 negative adjustment to inventory, a $278,000 negative adjustment for an Indiana tax provision, and approximately $1.1 million of negatively-impacting adjustments to prepaid expenses and accrued liabilities. (R. 4/24 pp. 109–24; R. 5/2 pp. 117–22; TXs 70, 88, 207).

GTI reviewed the accounting adjustments and errors it discovered with both its own auditors, BDO Seidman, and the Onkyo Defendants' auditors, D & T. (SR. 4/11 pp. 199–203; SR. 4/25 pp. 828–29; TXs 88, 91). Both of these accounting firms agreed that approximately $2 million worth of adjustments were required to be made to correct OAI's financials. (SR. 4/25 pp. 892–93; R. 5/2 pp. 117–22; TXs 88, 207).

GTI's Natan testified that the approximately $2 million in accounting adjustments and errors agreed to by GTI and BDO Seidman were incorporated in the financial statements of GTI's 10–K that was filed with the SEC on January 16, 2001. (SR. 4/25 pp. 892–93; TX 70).

The most significant of the errors and adjustments, the $649,000 inventory overstatement, was known to OAI management, specifically Pillow, before the clos-

ing.[18] (TX 212 at 1). Pillow, the person directly and primarily responsible for providing GTI with financial and due diligence materials, neglected to reveal the inventory error to GTI's Natan until a day or two after the acquisition closed. (R. 4/24 p. 103).

### 2. OAI's July and August actual results fell below projections

In addition to reductions for the accounting adjustments and errors, the OAI TTM EBITDA relied on by GTI had to be reduced based on OAI's earnings shortfall of approximately $839,000 during the months of July and August 2000. (SR. 4/11 pp. 197–98; R. 4/24 pp. 100–01).

As detailed in the GAM that GTI relied on in evaluating the purchase of OAI, GTI believed that OAI had an August 31, 2000 TTM EBITDA of $6.8 million. This figure was derived utilizing ten months of OAI's actual results and results as projected by pre-acquisition OAI's management for the months of July and August 2000. (SR. 4/11 p. 197; R. 4/24 pp. 100–01).

Once the actual results became available for July and August, it became apparent that those results were substantially different from what OAI had projected. (SR. 4/11 p. 197; R. 4/24 p. 101). Of the $1.3 million in EBITDA that OAI's management projected for July and August, OAI only achieved approximately $475,000. This $839,000 shortfall was 64% below what pre-acquisition OAI management represented to GTI, and caused a 12% reduction in OAI's TTM EBITDA as of the closing date. (R. 5/2 pp. 175–78).

Approximately $740,000 of the total $839,000 miss (83%) came in the month of August. The Court agrees with the testi-mony of Van Conway, GTI's expert witness, that the existence and severity of this miss would have become apparent to OAI's management in the course of their day-to-day liquidity analysis. (R. 5/2 p. 178). This establishes that the Onkyo Defendants either knew or should have known about this significant and material performance miss before the closing of the acquisition. But they failed to disclose the anticipated miss to GTI. (Id.).

### 3. Projected cost savings and sales forecasts were dramatically overstated

Shortly after the closing, GTI discovered that the projections for OAI's sales forecasts and cost savings provided by OAI's pre-acquisition management were dramatically overstated.

OAI's pre-acquisition management had represented to GTI that OAI was projecting approximately $2.7 million in annual cost saving measures. A report created by D & T appeared to support these projected savings. (TX 93). However, what OAI's management failed to do, and what Greg Coy testified D & T could not and did not do, was to evaluate the feasibility of actually implementing these cost savings measures to ascertain their true value. (R. 4/18 pp. 232–33; R. 5/2 pp. 125–29). After the acquisition, it became apparent that most of these savings were not viable cost-saving practicalities.

With regard to sales forecasts, OAI's pre-acquisition management projected large growth in OAI's baseline automotive, as well as its non-automotive and after-market sales. (TXs 227, 265, 439). During the creation of a revised FY 2000 budget, OAI inexplicably revised its sales forecasts and projected a more than $5.1

---

**18.** According to the testimony of Kevin Martin, OAI's vice president and general manager, OAI had a recurring problem of significant fluctuations in inventory levels on a monthly basis, and this was discussed at OAI's managers meetings. (R. 5/1 p. 100).

million increase in sales revenues for 2000, despite OAI's having missed its previously budgeted sales for the first half of the year. (R. 5/2 pp. 31–36; R. 5/23 pp. 25–26; TXs 213, 215).

These sales forecasts were not developed based on OAI's capabilities as applied to the industry's trends. Rather, these increased projections were created by OAI's Shimojima and Pillow without any reasonable basis to support the increases. And they were then provided to GTI and its lenders during negotiations and due diligence for the sale of OAI. (R. 5/2 pp. 31–36; R. 5/23 pp. 25–26, 64–66).

At least one OAI sales manager, Steve Gramig, had informed Shimojima, in writing, before Shimojima made the revised FY 2000 budget, that the revised sales projections were unreasonable and unattainable. And other OAI sales managers agreed with Gramig's assessment. (R. 5/1 pp. 35–39, 56–59, 63–64, 81–82, 93; TX 214). Gramig testified that even after communicating their concerns to Shimojima and Pillow, he and other sales managers were forced to feign agreement to Shimojima's projections under fear of losing their jobs. (R. 5/1 pp. 35–36). Nonetheless, Shimojima and Pillow directed that the inflated projections be incorporated into the FY 2000 revised budget. That revised budget was provided to GTI and others during due diligence. (R. 5/23 p. 28; R. 5/2 p. 35).

The FY 2000 budget was not the first time Shimojima had forced unrealistic projections on OAI's sales team. OAI's former vice president of marketing and sales, Lou Melillo, testified that in 1999, Shimojima had directed OAI's sales team to increase the year's projections by $10 million, despite the sales managers' warnings that such increases were not possible. (SR. 4/25 pp. 954–63).

At the same time Shimojima and Pillow were directing their sales managers to make arbitrary increases to OAI's sales projections that their sales managers did not agree with, they were preventing GTI from speaking with OAI's sales managers about those projections. (SR. 4/11 pp. 255–56; R. 5/1 p. 23; R. 5/16 pp. 186–87; TX 272). As evidenced in Shimojima's own correspondence to GTI's Willis, though Willis had asked to speak with Steve Gramig directly, Shimojima refused the request and directed Willis to speak with Pillow instead. (SR. 4/11 pp. 258–59; TX 272).

OAI's sales managers were not the only ones who opined that OAI's sales projections for the coming years were unreasonable. (SR. 4/25 pp. 964–67). In an e-mail from Onkyo Japan's CFO, Yasunori Hiruma, Mr. Hiruma recorded the Onkyo Defendants' knowledge and belief that the EBITDA targets in the Share Purchase Agreement, that were based on pre-acquisition OAI management's sale projections, were "impossible" for OAI to achieve. (R. 5/2 pp. 77–78, 82–83; TXS 309, 433).

OAI also had a history of repeatedly projecting large annual increases in non-automotive and automotive aftermarket business, only to repeatedly fail in meeting those projections. (R. 5/2 pp. 196–215). The evidence shows that there is no persuasive reason to believe that OAI had any significant levels of actual or prospective business in either the non-automotive or aftermarket speaker sectors at the time of closing. (R. 5/1 pp. 98–99; R. 5/2 pp. 198–201). The evidence further shows that OAI did not have any significant confirmed contracts with new customers, or significant purchase orders from such customers, and OAI did not have prospective customers whose potential future business could be reasonably relied on. (*Id.*).

#### 4. Key OAI personnel, Shimojima and Pillow, had undisclosed conflicts of interest

Unbeknownst to GTI, the OAI employee relied on almost exclusively for providing accurate financial due diligence information regarding OAI, Doug Pillow, had a conflict of interest of which he and the Onkyo Defendants were aware. (R. 5/16 p. 21). Before closing, the Onkyo Defendants discussed with and agreed to pay Mr. Pillow $100,000 if, but only if, OAI was sold to GTI. (R. 5/2 pp. 9–12; R. 5/16 pp. 49–50, 89–90; TX 2). Neither Mr. Pillow nor the Onkyo Defendants ever disclosed this fact to GTI, its lenders, or any entity performing due diligence with information received from Pillow. (R. 5/16 p. 90; SR. 4/11 p. 166).

According to Pillow's own testimony, his $100,000 payment resulted from a private meeting between himself, Chairman Otsuki and Shimojima, at which Chairman Otsuki told Pillow that he would "take care of him," if the transaction with GTI closed. (R. 5/2 p. 10).

The Court finds no evidence to support the Onkyo Defendants' claim that this payment to Mr. Pillow was for severance or retirement. Mr. Pillow was never terminated. He resigned from OAI entirely voluntarily on September 5, 2000, the day that the $100,000 bonus was wired to his account. (SR. 4/11 pp. 192–93; R. 5/2 p. 11). And, in doing so, he left a promotion, a raise, and generous stock options offered to him by GTI on the table. (SR. 4/11 pp. 167–77; R. 5/2 p. 23; TXs 5, 6, 8, 9, 10).

Also unbeknownst and undisclosed to GTI was the fact that before and after the acquisition for which he provided due diligence information to GTI, Shimojima owned 300,000 shares of, and was an active member of the board of directors for, Defendant Onkyo Japan. (R. 5/2 p. 55).

#### F. Impact of post-acquisition discoveries on OAI and GTI

Almost immediately after the acquisition, OAI encountered significant problems, including immediate liquidity problems. (R. 5/9 p. 195).

#### 1. OAI's financing jeopardized

Due to the accounting adjustments necessitated by the errors in OAI's financial statements inherited by GTI, OAI was in violation of its GMAC loan covenants immediately after the acquisition closed. (R. 4/24 pp. 123–24; SR. 4/25 pp. 886–887; R. 5/9 pp. 196–98, 223–24; TXs 104, 105). As detailed in the GMAC loan agreement, a substantial portion of OAI's revolving borrowing availability was calculated as a percentage of its inventory. (R. 5/9 pp. 217–24; TX 301). Therefore, the $650,000 inventory overstatement revealed to Plaintiffs by Pillow the day after closing was, in and of itself, almost enough to place OAI in violation of its loan covenants immediately post closing, and severely limited its borrowing availability. (R. 5/9 pp. 217–24).

Moreover, the total impact of OAI's overstated sales projections and accounting errors reduced OAI's TTM EBITDA as of August 31, 2000 from the $6.8 million figure projected by OAI's pre-acquisition management to approximately $4 million, an amount well below what OAI needed to meet its debt service obligations and operational requirements. (R. 5/9 pp. 204–05, 227; TXs 199, 124).

Mike Molenda, a former Vice President of GMAC and member of the due diligence team for the OAI acquisition, testified that had the accounting adjustments alone been disclosed prior to closing, the deal would not have even met GMAC's loan guidelines. (R. 5/9 pp. 232–33; TXs 119, 122).

### 2. OAI's problems with vendors and suppliers

Due to borrowing limitations caused by its loan covenant violations, and the increased payment demands of its suppliers, OAI was a company in an immediate cash-flow crisis. Though OAI continued to borrow as much as was or could be made available under its loan agreement with GMAC, in order to pay its vendors and keep supplies coming, there was never enough cash for OAI to become current on its outstanding bills. (R. 5/9 p. 197; R. 5/23 pp. 41, 135; R. 4/25 pp. 7–8; TX 121).

Ultimately, some of OAI's critical Asian parts and component suppliers refused to supply OAI on terms other than either payment-on-delivery, or payment-on-order. (R. 4/25 pp. 7–8; R. 4/17 pp. 62–81; R. 5/23 pp. 131, 153–55; TX 121).

Among these suppliers was Defendant Onkyo Electric (Malaysia) SDN. BDH. ("Onkyo Electric"), which by late 2000 had threatened to stop shipping critical tweeter components unless OAI sent immediate payment for all of OAI's past and current account balances. In fact, on two separate occasions, Onkyo Electric actually did refuse to send parts to OAI. (R. 4/17 pp. 62–81; TXs 192, 195, 201–203).

Without these critical tweeters, OAI would be unable to supply its primary customer, Delphi, who in turn would have been unable to supply GM. The daily fines for causing a shutdown of GM's production lines that OAI would be responsible for if it could not supply Delphi would have immediately bankrupted OAI. (R. 5/23 pp. 75–76; SR. 4/25 p. 910; TX 195).

Thus, in the absence of a supply of approved tweeters from Onkyo Electric, and in order to prevent a GM production shutdown, OAI was forced to supply Delphi with alternate tweeters OAI had previously ordered and tested, as a potential cost saving measure, from a Chinese supplier. (R. 4/18 p. 223; R. 4/17 p. 81). OAI did this without the knowledge or approval of Delphi or GM.

In September or October 2001, GM and Delco discovered the unapproved Chinese tweeters, when many of them turned up defective (TX 83). OAI incurred approximately $2.5 million in charge-backs as a result of the unapproved tweeters (TX 137; TX 71). GMAC's Diane Guzzo testified that OAI "couldn't survive" the impact of OAI's tweeter switch (TR 5/23 p. 134).

### 3. GTI's cash crisis

After its acquisition of OAI, GTI's developing OSA business continued to use cash at a fast rate. OAI's inability to generate its projected excess positive cash flows further complicated GTI's cash crisis. (R. 4/25 p. 11; TXs 262, 407).

Due to OAI's unexpected financial troubles and under-performance, OAI was never able to pay GTI its monthly management fee that would have been permitted under the terms of the credit agreement with GMAC, had OAI performed as represented and expected. (R. 4/17 p. 44; R. 4/25 pp. 10–11; TX 262). Rather than generating cash for GTI, OAI became an additional drain on the company's already limited resources, and its under-performance exacerbated GTI's financial woes. (R. 4/17 pp. 46, 57–58; R. 4/25 p. 11).

### 4. GTI's guarantee of OAI's debt obligations to GMAC

Under OAI's loan agreement with GMAC, GTI was a guarantor of all of OAI's outstanding indebtedness to GMAC, and therefore, to the extent OAI did not have sufficient cash to meet its payment obligations under the loan agreement, GTI would be liable to make up any shortfalls. (R. 5/9 p. 209; R. 4/25 pp. 35–36; TX 223).

The loan guarantee became a financial concern to GTI almost immediately after the closing, because OAI was in near immediate violation of its loan covenants after the closing and was facing its own cash crisis. (R. 4/17 pp. 57–58; R. 4/25 p. 35; TX 147). GMAC began putting pressure on GTI to improve OAI's financial condition or make its payments almost immediately after the closing. (R. 5/9 p. 236).

### 5. Attempts to mitigate the impact of post-acquisition discoveries

GTI's Board of Directors authorized Will Willis to go to Japan and attempt to negotiate payment and tweeter supply-concessions with the Onkyo Defendants, based on the immediate effects of the cash crises at both OAI and GTI that resulted from GTI's post-acquisition discoveries concerning the true condition of OAI. (R. 4/17 pp. 50–51).

These negotiations were critical to GTI because, without any deferment of GTI's payment obligations to the Onkyo Defendants under the promissory notes, GTI would be unable to get a clean audit opinion, and the GMAC loan would fall further into default. (R. 4/17 p. 49). In addition, if Onkyo Electric persisted in its refusal to ship OAI tweeter supplies, OAI would not be able to honor its contracts with Delphi and GM. (R. 4/17 p. 81).

GTI made two main allegations to support the requested concessions. First, GTI claimed that there was "softness" in the automobile market immediately after the acquisition. Willis wrote a letter to Otsuki on December 18 stating that "the automotive industry is very sick." (TX 304). GTI's 10-Q for the period ending March 31, 2001, similarly stated, "Beginning in the second half of calendar year 2000, the United States economy began to weaken. The Company was not aware of this change at the time of its August 31,

2000 acquisition of OAI. The downturn was not felt at OAI until mid-November 2000 when OEMs in the United States experienced a sudden and material reduction in the sales volume of new car purchases." (TX 154).

Second, GTI proposed significant accounting adjustments to OAI's pre-acquisition financial statements (TX 88).

On December 22, 2000, Willis met with representatives of the Onkyo Defendants in Japan (TR 4/17 p. 51). That meeting focused on GTI's requests for concessions (*id.*). As a result of that meeting, Onkyo agreed to all of Willis's requests for concessions, including a one-year extension of certain payables, an extension of OAI's right to use the "Onkyo" brand, and the $1 million reduction of the promissory notes (*see* TR 4/17 pp. 51–52; TX 380).

In exchange for these concessions, on January 6, 2001, GTI and OAI were required to execute and transfer a release to the Onkyo Defendants releasing the Onkyo Defendants from all claims relating to or arising from alleged breaches by the Onkyo Defendants of the representations and warranties sections of the Share Purchase Agreement. (R. 4/18 pp. 51–52; PTO p. 6; TX 190).

### G. The demise of OAI

#### 1. GTI management removed

In October 2001, the day-to-day operations of OAI were taken over by GMAC and a consulting firm retained by GMAC, BBK, Ltd. ("BBK"). (R. 4/17 pp. 85–86; R. 4/25 pp. 11–12; TXs 137, 390). GMAC officials assumed all responsibility for OAI's operations and for managing customer relations, during what GMAC considered to be a winding down of OAI's operations. (R. 4/17 p. 85; Dep. Troy Wilson at pp. 83–84).

As soon as GMAC and BBK took over OAI's operations, Willis and Natan were effectively removed from any control over or access to OAI and its facilities. Willis and Natan were not permitted to travel to the OAI facilities where its physical assets and records were located. (R. 4/17 pp. 85–86; R. 4/25 pp. 11–12).

## 2. Bankruptcy and liquidation

In a last attempt to negotiate with the Onkyo Defendants regarding OAI's payment obligations under the promissory notes, Willis scheduled a meeting with representatives of the Onkyo Defendants at their attorneys' offices in Indianapolis. (R. 4/17 pp. 86–87). At that meeting, however, the Onkyo Defendants' lawyers informed Willis that the Onkyo Defendants were calling in the notes and demanding immediate payment. (*Id.*).

On December 18, 2001, after the Onkyo Defendants called in their promissory notes, GTI and its affiliated debtors, On-Site Analysis, Inc., ARCS Safety Seat, Inc., Top Source Oil Analysis, Inc. and Top Source Automotive, Inc., filed cases under chapter 11 of the Bankruptcy Code. (PTO p. 5). Likewise, on December 19, 2001, OAI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (PTO p. 5).

In approximately January 2002, GMAC, along with BBK and their agents, began the liquidation of OAI's assets. OAI's physical assets were disposed of without notice to or consultation with Willis or Natan, or with any other agent of GTI. (R. 4/17 pp. 88–89; R. 4/25 pp. 15–16).

## H. Further factual findings, concerning GTI's claims

With respect to the elements of Plaintiff GTI's claims concerning the alleged fraudulent transfers, the Court finds as follows:

### 1. GTI's multiple creditors before and after the closing

It is undisputed that both before and after the OAI acquisition, GTI had, among others, the following creditors: (1) NCT Audio; (2) The Ganz Noteholders (specifically, Harvey R. Sorenson, Trustee Eleanor P. Marshall Stevens Charitable Trust Invest Partnership, Arthur Horowitz and Bernice Horowitz, The Nancy and Charles Ganz Family Supporting Foundation, The Pearlstone Family Fund, The Pearlstone Foundation for Jewish Living, The Pearlstone Institute for Living Judaism, Frederick D. Tecce, and the Louise and Morton Macks Family Foundation); (3) Thompson McDaniel; and (4) Burnette Insurance Agency, Inc. (SR. 4/11 pp. 48–50, 157–64; TXs 70, 238, 164, 165, 437, 409, 48, 435, 436).

### 2. The fair market value of OAI's equity

The Plaintiff's expert, Van Conway, testified that as of the August 31, 2000 closing, the true fair market value of OAI's equity (*i.e.,* the OAI stock purchased by GTI) ranged from a low of only $1.4 million to a high of $6.9 million—far less than the $25 million paid by GTI.[19] (R. 5/2 p. 165).

---

**19.** The Defendants have argued that Mr. Conway failed to consider several direct and indirect economic benefits GTI allegedly gained from the OAI acquisition, in addition to the value of the OAI stock. Assuming for the moment that this is even relevant, the Court finds that this argument is contradicted by the testimony presented at trial. Mr. Conway testified that he considered each of the alleged other benefits to GTI and in his opinion their value was zero. The Court also finds that (1) with the exception of GTI's temporarily avoiding being de-listed from the American Stock Exchange, the benefits that GTI had hoped for before closing the acquisition of OAI, described in Part III–D of this opinion,

Conway used the following four accepted methods to calculate the fair market value of OAI's equity: (1) the capitalization (multiple) of historical trailing twelve months EBITDA method; (2) the discounted projected cash flow method; (3) the guideline public company method; and (4) the comparable company transactions method. (R. 5/2 pp. 165–272).

The Defendants' expert, Jeffrey M. Risius, used the last three of these methods. Weighing the valuations derived from his three methods, Risius placed the fair market value of OAI's equity at $39.7 million (TR 6/12 p. 7, 80–82; *see also* Risius Slide 16).

### (a) The capitalization (multiple) of historical trailing twelve months EBITDA

As Mr. Conway explained, the valuation method referred to here as the "capitalization (multiple) of historical trailing twelve month EBITDA method" involves developing a valuation multiple to apply to a measure of income for a single period (here, the trailing twelve month EBITDA ("TTM EBITDA")), in order to determine the enterprise value of the subject company. Interest bearing debt is then subtracted from the enterprise value to arrive at the fair market value of the equity of the subject company.

The Court finds that Mr. Conway correctly applied this valuation method to calculate a fair market value for the equity of OAI of $6.7 million as of August 31, 2000. (R. 5/2 pp. 169–82).

In so finding, the Court finds that Mr. Conway appropriately utilized an approximate $4 million TTM EBITDA figure for OAI. In the Court's view, OAI's most recent twelve-month EBITDA as of the closing date is the most reliable and least speculative basis for analyzing and evaluating OAI's reasonably expected future performance. (R. 5/2 pp. 171–73).

### (b) The discounted projected cash flow

As explained by each side's expert, the discounted projected cash flow method (sometimes referred to as a "DCF" method) involves projecting expected future economic benefits (net cash flow) and discounting each expected benefit back to present value at an appropriate risk adjusted rate of return. This yields an enterprise value of the subject company. Interest bearing debt is then subtracted from the enterprise value to arrive at the fair market value of the equity of the subject company.

As one case recently described, the enterprise value is calculated under this method in this way:

A DCF analysis arrives at a value, or a range of values, for a company by performing the following steps: (1) determine the projected distributable cash flow of a company within a forecast period of time; (2) determine the company's terminal value by the end of a forecast period, by applying a selected metric of value, which is usually a company's

---

were highly speculative and in fact turned out to be unachievable; and (2) the *net value to* GTI of all the alleged other benefits from the acquisition of OAI, including GTI's temporarily avoiding the de-listing of its stock, was zero or less, because any value from these other benefits was outweighed by the economic damage GTI suffered from acquiring OAI. This is because, as the Court has found, OAI

was a serious cash *drain* on GTI from the time of the acquisition forward. *See, e.g.,* Part III–F–3 of this opinion. And this result was predictable from information known and available to OAI's management, but not disclosed to GTI's management, prior to the acquisition. *See* Parts III–E and III–F of this opinion.

EBITDA, to an appropriate multiple; (3) determine the present value of both free cash flow and terminal value of the company by applying an appropriate discount rate; (4) calculate the sum of the present value of cash flow and present value of terminal value, which represents the total enterprise value of the company.

*In re Young Broadcasting Inc.*, 430 B.R. 99, 126 (Bankr.S.D.N.Y.2010).

Mr. Conway applied the discounted projected cash flow method to calculate a $1.4 million value for the equity of OAI. (R. 5/2 pp. 182–262). Mr. Risius, on the other hand, calculated a value of $38.3 million using a DCF approach (TR 6/12 p. 61).

The Court first finds that Mr. Conway correctly determined that the revenue projections for OAI received from OAI's pre-acquisition management, and incorporated into the GAM, were unreasonable. (R. 5/2 pp. 184–220). The Court finds these revenue projections to be unreasonable based on the following facts: (1) the GAM sales projections for OAI's automotive, non-automotive, and aftermarket lines bear no relationship to the company's historical results; (2) more than 88% of OAI's business was to automotive customers, and as of the August 31, 2000 closing, CSM [20] was projecting a decline in production in the automotive industry in 2001, 2002, and 2003; (3) GM, which accounted for 55% of OAI's total business, was projected to have a 5.5% decline—a decline that was larger than that of the total automotive industry; (4) the GAM projections for GM sales, and those contained on spread sheets authored by pre-acquisition OAI and included in OAI's Budget Roll–Up, bear no rational relationship to the CSM projections for GM production; (5) OAI would have been unable to increase sales in the automotive sector in the short term because business in that sector typically does not result in actual sales or revenue until several years after business is awarded to a supplier; (6) OAI had demonstrated a historical inability to grow its sales even when the industry and its peers were realizing significant growth; (7) OAI had demonstrated an historical inability to create accurate projections, especially in the non-automotive and aftermarket sectors; (8) no contracts or purchase orders ever existed to support the dramatic growth in sales projected by OAI in the GAM; and (9) OAI's own experienced sales managers did not believe that OAI would ever be able to achieve the sales levels contained in the revised FY 2000 budget given to GTI by OAI's pre-acquisition management and incorporated into the GAM. (*Id.*).

The Court finds that Mr. Conway correctly determined that the gross margin projections for OAI that were incorporated into the GAM were likewise unreasonable. (R. 5/2 pp. 201–04). This finding is based on the following facts: (1) the projections for OAI's gross margins bear no relationship to the company's actual historical margins; (2) the margin projections failed to consider the impact of OAI losing its most profitable Jeep sound-bar business; (3) the margin projections failed to consider the impact of known annual price givebacks of approximately 2.5% that were historically required by OAI's automotive customers; and (4) the margin projections rely on OAI's unreasonable non-automotive and aftermarket sales projections. (*Id.*).

The Court also finds that, after considering all of the relevant information that

---

**20.** Each side's expert recognized CSM, an independent company that creates, among other things, production forecasts for the automotive industry, as a reliable source of such information.

was known or should have been known at the time of the acquisition, including OAI's historical performance and public information regarding the automotive industry's outlook, Mr. Conway correctly formulated his own independent, reasonable projections for OAI's expected sales and margins—which projections, if anything, were too favorable to OAI—and applied those to the discounted cash flow methodology. (R. 5/2 pp. 220–33).

The Court finds that the Onkyo Defendants' expert Jeffrey Risius's application of the discounted cash flow methodology unreasonably relies on the sales and margin projections contained in the GAM. Mr. Risius simply discounted OAI's projections by nominal percentages to arrive at inputs for his discounted cash flow analysis. He did not adequately evaluate the reasonableness of the starting point for his analysis. As such, the sales and margin projections utilized by Mr. Risius were as unreasonable and unreliable as the projections contained in the GAM, thus rendering the results of his discounted cash flow analysis similarly unreasonable.

Another difference between the DCF analyses of Conway and Risius is the discount rate they used to discount the projected cash flow back to present value, which the experts each referred to as the "weighted average cost of capital" or "WACC." (R. 5/2 p. 240, 250; Conway Slide 28). Conway used a WACC of 16%; Risius used a WACC of 14%. Conway testified that if he were to use Risius's WACC of 14% instead of the 16% he used, the $1.4 million value of the OAI equity that Conway calculated using a WACC of 16% "goes up to about $6 [million]." (R 5/2 at p. 255).

Plaintiff GTI's expert Conway candidly acknowledged that choosing an appropriate WACC is something that takes "a fair amount of professional judgment," and on which reasonable experts can differ. (*See* R 5/2 at pp. 250–51, 254–55, 257). And while each side's expert explained at some length how he calculated the WACC that he used, and criticized the other's calculated WACC (*e.g.,* R 5/2 at pp. 240–257; R 6/12 at pp. 49–55; Risius Slide 6; R 6/13 at pp. 14–18), the Court concludes that neither expert's explanation and support for his chosen WACC was persuasive.

For all of these reasons, the Court does not accept either expert's valuation based on the discounted projected cash flow, or DCF, method, given the evidence presented in this case.

### (c) Guideline public companies

According to both sides' experts, the guideline public company valuation method is a market approach to value the enterprise that uses the market price of common stock of publicly traded companies that have similar characteristics to the subject company. A trading multiple is then developed and applied to an earnings stream of the subject company to provide an indication of value of the subject company.

Mr. Conway applied the guideline public company method to calculate a fair market value of the equity of OAI of $2 million. (R. 5/2 pp. 262–66; Conway Slide 30).

By analyzing nine companies that supplied speaker parts to the automotive industry and seven companies from the electronic manufacturing industry, Mr. Conway developed a trading multiple of 5.25 based on the ratio of enterprise value to TTM EBITDA of companies with similar characteristics to OAI. He then applied that multiple to OAI's August 31, 2000 TTM EBITDA of $4 million to calculate an enterprise value, from which he then subtracted interest bearing debt to

arrive at a fair market value of OAI's equity. (*Id.*).

Mr. Risius used the guideline public company method to calculate a value of $38.5 million for OAI's equity. (Risius Slide 12). One key difference between the experts' guideline company methodologies is that Conway used multiples based on a comparison of OAI's trailing twelve month performance ("TTM") to the TTM of the comparable companies, whereas Risius employed a forward-looking approach. (TR 6/12 pp. 63–64). The Court finds that Risius's forward-looking approach is not appropriate in this case, because it was based on his unreasonable projections for OAI's performance after the closing date, and because, as the Court has found, OAI's most recent pre-acquisition performance, including its TTM EBITDA, was the best indicator of its future performance.

#### (d) Comparable company transactions

As both experts explained, the comparable company transactions valuation method is a market approach to value a subject enterprise. This method uses the aggregate value of the stock of similar closely-held companies based on contemporaneous merger or acquisition transactions. The selected transactions involve companies with similar characteristics to the subject company. A valuation multiple of the comparable companies is then developed and applied to an earnings stream of the subject company to provide an indication of the enterprise value of the subject company, from which interest bearing debt is subtracted to arrive at a fair market value of the company's equity.

Mr. Conway applied the comparable company transaction method to calculate a fair market value of the equity of OAI of $6.9 million. (R. 5/2 pp. 266–71).

Mr. Conway analyzed four transactions involving closely-held manufacturers of au-

tomotive parts and accessories with similar characteristics to OAI, and developed an average multiple of 6.5 based on the ratio of enterprise value to EBITDA. He then applied that multiple to OAI's TTM EBITDA of $4 million to calculate an enterprise value, from which he subtracted the interest bearing debt to calculate fair market value of OAI's equity. (*Id.*).

In contrast to Mr. Conway, Mr. Risius used the comparable company transaction method to calculate a value of $45 million for OAI's equity. (Risius Slide 15). The Court finds that Mr. Risius's reliance on OAI's projected EBITDA for 2000, which includes his unreasonable projections for OAI's performance after the closing date, as opposed to OAI's TTM EBITDA as of August 31, 2000, was unreasonable, and renders his analysis under the comparable company transaction methodology unreasonable as well.

#### (e) Conclusion regarding the fair market value of OAI's equity as of August 31, 2000

For the reasons stated above, the Court rejects each of the three valuations of OAI's equity that were made by the Defendants' expert Mr. Risius, finding them to be unreasonable and unpersuasive. As for Mr. Conway's four valuations, the Court rejects Mr. Conway's projected cash flow (DCF) analysis for the reasons stated above. That leaves Mr. Conway's remaining three valuations of OAI's equity as follows: (1) capitalization (multiple) of historical trailing twelve month EBITDA method: $6.7 million; (2) guideline public company method: $2 million; and (3) comparable company transaction method: $6.9 million.

Of these three methods/valuations by Mr. Conway, the Court is most persuaded by the first and the third, which calculate

values of $6.7 million and $6.9 million, respectively, and of these two methods, the Court is most persuaded by the third method, which yields a value of $6.9 million. From the evidence, the Court finds that GTI has met its burden of proving, by a preponderance of the evidence, that the fair market value of OAI's equity as of August 31, 2000 was $6.9 million. The Court finds this to be the value. GTI has *not* met its burden of proving, by a preponderance of the evidence, that the fair market value of OAI's equity as of August 31, 2000 was *less than* $6.9 million.

### (f) The value of the promissory notes that GTI gave in exchange for OAI on August 31, 2000

The parties' experts agree that the 7.5% interest rate on the $12 million in promissory notes that GTI gave to the Onkyo Defendants was substantially below the market rate. (TR 5/9 p. 32; TR 6/13 pp. 24–28). Mr. Risius applied a discount rate based on the market rate for unsecured debt to GTI, and determined that the promissory notes had an actual value of $8.6 million (TR 6/13 pp. 24–28).

Mr. Risius's approach here is reasonable, and GTI offered no competing discounted valuation of the notes. The Court credits Risius's conclusion that the notes were worth $8.6 million when given, rather than their face value of $12 million.

### 3. At fair valuation, the sum of GTI's debts exceeded its assets

The Court finds that as an immediate result of the OAI acquisition, the sum of GTI's debts was greater than all of its assets at a fair valuation. In so finding, the Court credits and relies on the expert opinion of Mr. Conway, to the extent of determining that as of August 31, 2000, the value of GTI's liabilities exceeded the fair

value of its assets by at least $12.2 million. (R. 5/8 pp. 21–35).

The Court finds that Mr. Conway correctly relied on GTI's post-closing balance sheet as of August 31, 2000. He then adjusted the value of assets and liabilities of GTI to their fair market values, in determining that the fair market value of GTI's assets was greater than the value of its liabilities. (*Id.*)

In doing this, Mr. Conway made two adjustments to GTI's post-closing balance sheet.

First, with respect to GTI's assets, Mr. Conway correctly reduced the $16.8 million book value of GTI's investment in OAI to a number reflecting the true value of OAI's equity. By subtracting the debt incurred to purchase the equity (approximately $10 million) from the $6.9 million value of the equity, as determined by the Court above, the resulting negative number supports a finding that the value of GTI's investment in OAI was zero. The Court finds that the value of GTI's investment in OAI immediately after the acquisition on August 31, 2000 was zero. (R. 5/8 pp. 21–22).

Second, with respect to GTI's liabilities, Mr. Conway assumed that GTI had a $3.1 million obligation to GMAC, based on GTI's guarantee of OAI's loan from GMAC. He assumed that it was probable that GTI would have to pay GMAC this $3.1 million to make up for what Conway projected would be OAI's 2000 year-end collateral deficiency. (R. 5/8 pp. 14–16).

Before properly including this projected OAI collateral deficiency as a liability of GTI, however, one must recognize that it is a contingent future liability, the existence and amount of which is dependent on (1) OAI's failure to stay within loan covenants as of December 31, 2000, (2) GMAC calling the loan in full against OAI, without waiver of any covenant violations, (3) a

collateral deficiency at the OAI level, (4), the amount of that deficiency, and (5) proceedings by GMAC against GTI through the guarantee (*see* TR 5/9 pp. 115–131). Including the entire $3.1 million as a liability as of August 31, 2000 necessarily assumes that each of those conditions is 100% certain, yet Conway agreed such certainty is not warranted (TR 5/9 pp. 112–13).

The Court concludes that GTI has failed to prove that these conditions were sufficiently likely to occur, such that *any* of this contingent liability should be added to GTI's balance sheet as of August 31, 2000.

By reducing GTI's investment in OAI downward to appropriately reflect the fair market value of the net assets acquired by GTI, and without even considering what Conway says was GTI's $3.1 million obligation to GMAC as OAI's guarantor, the Court finds that as of August 31, 2000, GTI had assets of approximately $8.2 million and liabilities of at least $20.4 million. (R. 5/8 pp. 33–35). Thus, GTI's liabilities exceeded the fair market value of its assets by at least $12.2 million. (*Id.*)

Mr. Risius opined that GTI was not rendered insolvent by the transaction (TR 6/13 p. 53). He used GTI's share price, as determined on the AMEX, to adjust GTI's book value to market value. He thereby determined the market value of GTI's assets as a whole, net of its debt (TR 6/13 pp. 32–33). The Court finds that Mr. Risius's use of this approach to determine GTI's fair market value is unreasonable. (R. 5/8 pp. 24–32).

As explained by Mr. Conway, a proper use of the market approach requires the existence of an efficient market for GTI's publicly-traded stock. Based on the record before it, the Court finds that the market for GTI's stock as of August 31, 2000 was not efficient because it did not quickly reflect new information such as

OAI's accounting errors and unreasonable projections, and therefore, it did not know that GTI had drastically overpaid for OAI.

Moreover, GTI's stock was not actively traded, was not held in significant numbers by institutional investors, and was not covered by any research analysts. As a result, the market price of GTI's stock could not reasonably reflect the value of GTI's investment in OAI. (*Id.*)

## IV. Discussion

### A. The $13 million cash transfer and the $12 million in promissory note obligations GTI incurred to the Onkyo Defendants are avoidable fraudulent transfers under Fla. Stat. 726.106(1).

Under 11 U.S.C. §§ 544(b) and 550, GTI may avoid any transfer of an interest of GTI in property, or any obligation incurred by GTI, that is voidable under applicable law by a creditor holding an unsecured claim, and may recover the property transferred or the value of such property for the benefit of the estate. *See Moecker v. Johnson (In re Transit Group, Inc.)*, 332 B.R. 45, 52 (Bankr.M.D.Fla.2005); *Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr.M.D.Ga.1993)(citing *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) (a "transaction that is voidable by a single, actual unsecured creditor may be avoided in its entirety, regardless of the size of the creditor's claim")).

The applicable law under which GTI seeks to avoid the $13 million cash transfer and the $12 million in promissory note obligations is Florida's Uniform Fraudulent Transfer Act, Fla. Stat. 726.101, et seq.

To prevail under Fla. Stat. 726.106(1), GTI must prove: (1) that an actual creditor exists whose claim arose before the transfers and obligations; (2) that GTI

received less than reasonably equivalent value in exchange for the transfer and obligations; and (3) that GTI was insolvent at the time, or became insolvent as a result of, the transfers and obligations. Fla. Stat. 726.106(1).

To prevail under its alternative statutory theory, Fla. Stat. 726.105(1)(b), GTI must prove: (1) that an actual creditor exists whose claim arose before or after the transfers and obligations; (2) that GTI received less than reasonably equivalent value in exchange for the transfers and obligations; and (3) that GTI was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or that GTI intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. Florida Stat. 726.105(1)(b).

### 1. An actual creditor

Under Fla. Stat. 726.106(1), GTI bears the burden of proving the existence of an actual creditor whose claim arose before the transfers and obligations. Fla. Stat. 726.106(1). GTI has met this burden. The Court finds that NCT, the Ganz Note Holders, Thompson McDaniel, and Burnette Insurance Agency are all creditors whose claims arose before GTI's acquisition of OAI.

### 2. Reasonably equivalent value

■ "The purpose of voiding transfers unsupported by reasonably equivalent value is to protect creditors against the depletion of a bankrupt's estate." *General Electric Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir.1990). The Supreme Court has held that reasonably equivalent value means the debtor received a "fair and proper

price" for its transfer. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *see also WRT Creditors Liquidation Trust v. WRT Bankruptcy Litigation Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 404 (Bankr.W.D.La.2001). Generally, a "fair and proper price" should be similar to fair market value. *BFP*, 511 U.S. at 545, 114 S.Ct. 1757.

■ A determination of reasonably equivalent value "must be based upon all the facts and circumstances of each case and is not capable of precise computation." *Bakst v. Levenson (In re Goldberg)*, 229 B.R. 877, 884 (Bankr.S.D.Fla.1998).

■ Under Florida law, a lack of reasonably equivalent value can be shown by proving that the value actually received was less than or equal to 70% of the value given. *Id.* at 884–85 (validating the 70% rule as "a useful guideline by which the bankruptcy court may evaluate the fairness of a transfer and the requirement of reasonably equivalent value").

■ As the Court has found in Parts III–H–2(e) and (f) of this opinion, the fair market value of OAI's equity was $6.9 million, far less than the value of the purchase price paid by GTI—$21.6 million (the $13 million in cash plus the $8.6 million value of the promissory notes)—and well below the 70% guideline established by the case law. As a result, the Court concludes that GTI received less than reasonably equivalent value (*i.e.*, the fair market value of the equity of OAI) in exchange when it transferred the $13 million in cash to the Onkyo Defendants and incurred the $12 million in promissory note obligations.

### 3. Insolvency

■ Under Section 726.103, Florida Statutes, a debtor is insolvent if the sum of the debtor's debts is greater than all of the

debtor's assets at a fair valuation. This is commonly known as the balance sheet test for insolvency. A rebuttable presumption of insolvency also arises if a debtor is generally not paying its debts as they become due. Fla. Stat. 726.103 (2005).

◼ In the case of a business that qualifies as a "going concern," assets are valued at their market rather than distress (*i.e.,* liquidation) value, but the valuation must be done in a "realistic framework" considering amounts that can be obtained within a reasonable time, by a willing seller from a willing buyer.[21] *Heilig–Meyers Co. v. Wachovia Bank, N.A. (In re Heilig–Meyers Co.),* 319 B.R. 447, 457–58 (Bankr. E.D.Va.2004); *In re Transit,* 332 B.R. at 55.

◼ Moreover, "assets should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts." *In re Transit,* 332 B.R. at 55.

◼ On the liabilities side, the court must consider contingent liabilities that are likely to arise. *Davis v. Suderov (In re Davis),* 148 B.R. 165, 176 (Bankr.E.D.N.Y.1992)(including the entire amount of a guarantee as a liability for purposes of an insolvency analysis where the guarantee was likely to be called upon).

The Court has found, in Part III–H–3 of this opinion, immediately after the August 31, 2000 transaction, GTI's liabilities exceeded the fair market value of its assets by at least $12.2 million. Therefore, the Court concludes that GTI became insolvent as a result of the OAI acquisition.

#### 4. Conclusion regarding avoidabililty

◼ Based on the foregoing, the Court concludes that the $13 million in cash transfers and $12 million in promissory note obligations that GTI transferred and incurred to the Onkyo Defendants, in connection with the OAI acquisition, are avoidable fraudulent transfers under Fla. Stat. 726.106(1), made applicable by 11 U.S.C. § 544(b). Because of this conclusion, it is unnecessary to determine whether the transfers and obligations also are avoidable under Fla. Stat. § 726.105(1)(b).

### B. Defendants are "good faith transferees" and "good faith obligees" under Fla. Stat. 726.109(4).

◼ Under Section 726.109(4), Florida Statutes, a "good faith transferee" is entitled to a credit in the amount the value the transferee gave to the debtor for the transfer or obligation. *See* Fla. Stat. 726.109(4)(c).[22] The Onkyo Defendants bear the burden of proving their good faith transferee status. *See Breeden v. L.I. Bridge Fund, LLC (In re The Bennett Funding Group, Inc.),* 232 B.R. 565, 573 (Bankr.N.D.N.Y.1999).

The parties have very different views of what "good faith" means in this context. Plaintiff GTI cites numerous authorities

**21.** An asset must have "an existing and not theoretical market." *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1067 (3rd Cir. 1992). For this reason, a majority of courts prefer to utilize an asset-by-asset balance sheet approach for valuation rather than one based on public stock prices. *Heilig–Meyers Co. v. Wachovia Bank, N.A. (In re Heilig–Meyers Co.),* 319 B.R. 447, 463 (Bankr.E.D.Va.2004)(electing to "follow a majority of courts and adopt a balance sheet test of debtor's solvency").

**22.** Fla. Stat. § 726.109(4) provides, in relevant part: "Notwithstanding voidability of a transfer or an obligation under ss. 726.101–726.112, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to ... [a] reduction in the amount of the liability on the judgment." Fla. Stat. § 726.109(4)(c).

applying fraudulent transfer laws *other than* the Florida statutes that govern in this case, to argue the following:

"In the constructive fraudulent conveyance context, the term good faith "does not merely mean the opposite of the phrase actual intent to defraud." *Carr v. Demusis (In re Carr)*, 34 B.R. 653, 657 (Bankr.D.Conn.1983) (citing *Greenbrook Carpet Co. (In re Greenbrook Carpet Co.)*, 22 B.R. 86, 90 (Bankr.N.D.Ga. 1982)).

Rather, a lack of good faith "implies a duty upon the transferee to deal honestly, openly and fairly." *Id.*; see also *In re Bennett*, 232 B.R. at 573 (holding that "[i]n the context of a transfer that is avoided as constructively fraudulent ... the transferee acts in good faith only where it has an honest belief in the propriety of the activities in question, no intent to take unconscionable advantage of others, no actual intent to defraud others, and no knowledge that the transaction would operate to defraud others")(citing *Colonial Realty Co. v. Cahill (In re Colonial Realty)*, 210 B.R. 921, 923 (Bankr.D.Conn.1997)).

Moreover, a transferee necessarily lacks "good faith" where the price paid for property transferred is so grossly inadequate that it is inconceivable that the transferee could have believed that a fair price was paid. Joseph M. Bassano, American Jurisprudence: Good faith requirement Effect of knowledge of voidability, 9C Am.Jur.2d Bankruptcys 2118 (2005) (citing *Carr*, 34 B.R. at 657); see also *In re Bennett*, 232 B.R. at 573."

(Docket # 208 at 45–46).

Applying these standards, GTI argues that the Onkyo Defendants were not good faith transferees, because they "failed to deal honestly, openly and fairly in selling OAI to GTI and that the Onkyo Defendants knew OAI was not worth even close to the $25 million purchase price." (*Id.* at 46).

More specifically, GTI argues that:

[T]he following facts [evidence] the Defendants' bad faith: (1) the approximately $2 million in undisclosed accounting errors requiring adjustment to OAI's financial statements after the OAI acquisition, including a $650,000 inventory overstatement; (2) the Defendants' pre-closing awareness of the $650,000 inventory error; (3) the Defendants' failure to disclose the $650,000 inventory error to GTI; (4) the Defendants' secret agreement with OAI's CFO, Doug Pillow, to pay him a deal-closing incentive bonus of $100,000 after the close of the OAI acquisition using post-acquisition OAI's cash; (5) the Defendants' failure to disclose to GTI such incentive agreement, or the subsequent payment made there under; (6) the Defendants' payment of $120,000 to OAI's CEO, Shinobu Shimojima, two days prior to the execution of the Agreement; (7) the Defendants' failure to disclose such payment; (8) the Defendants' intentionally and artificially inflated budget and sales projections for OAI; (9) the Defendants' knowledge that OAI's 2000 budget was intentionally inflated; (10) the Defendants' deliberate actions in preventing GTI from speaking to OAI sales managers, including Mr. Gramig, during due diligence; (11) the recorded directive of the Chairman of Onkyo Japan, Naoto Otsuki, to "just sell it [OAI], even for free;" and (12) Yasunori Hiruma's, acknowledgment of the Defendants' belief that the EBITDA targets stated in the Share Purchase Agreement were "impossible" for OAI to achieve.

(*Id.* at 46–47).

 The Court must reject GTI's arguments, however, because they are inconsistent with Florida law. As the Onkyo

Defendants correctly argue, under Florida law, a transferee can establish that it acted in good faith even if, at the time of the transfer, it had "knowledge that the debtor [was] insolvent, that there [were] other creditors, that the debtor [was] transferring the assets in an attempt to defraud his own creditors, and that the effect of the transfer of the asset will be to defeat his creditors claims." *Bakst v. Levenson (In re Goldberg)* 229 B.R. 877, 886 (Bankr. S.D.Fla.1998); (relying, in part, on *Miles v. Katz*, 405 So.2d 750, 751 (Fla.Dist.Ct. App.1981), and *Mission Bay Campland, Inc. v. Sumner Fin. Corp.*, 731 F.2d 768 (11th Cir.1984)). Only if the transferee "(1) took the conveyance for the purpose of aiding in the fraud; or (2) actively participated in the debtor's fraudulent purpose to defeat the claims of other creditors," is the good faith defense unavailable to the transferee. *Id.*

■ GTI has not alleged in this case, nor is there any evidence, that GTI made the transfer or incurred the obligations with a fraudulent purpose, or that the Onkyo Defendants participated in the transaction for the purpose of defeating the claims of GTI's creditors. Defendants therefore have established that they are "good faith transferees" and "good faith obligees" within the meaning of Fla. Stat. § 726.109(4)(c).

## C. The Onkyo Defendants' proofs of claim

■ Under 11 U.S.C. § 502(d), the proofs of claim filed by the Onkyo Defendants in the GTI bankruptcy case must be

disallowed because, as the Court has concluded, the Onkyo Defendants are entities from which property is recoverable under 11 U.S.C. § 550 and are transferees of transfers avoidable under 11 U.S.C. § 544. *See* 11 U.S.C. § 502(d).[23] The Court will include in its judgment an order that the Onkyo Defendants' claims are disallowed, unless and until the full amount of the money judgment to be entered is paid.

## D. Prejudgment interest

■ For the reasons discussed in this opinion, the Court will grant Plaintiff GTI relief that includes a judgment for $6.1 million. This equals the amount of the $13 million cash transfer that GTI made to the Onkyo Defendants, minus the $6.9 million value of the OAI stock that GTI received. GTI seeks prejudgment interest.

■ It is well-settled that, unless prohibited by a statute, bankruptcy courts, as units of the district court under 28 U.S.C. § 151, have broad discretion in determining whether to award prejudgment interest based on the particular equities of a case. *See, e.g., Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616, 619 (6th Cir.1998); *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988, 989–90 (6th Cir.1982); *Smith v. Am. Int'l. Life Assur. Co. of New York*, 50 F.3d 956, 958 (11th Cir.1995).

Although 28 U.S.C. § 1961(a) applies only to post judgment interest, this statute does not prohibit an award of prejudgment interest, and some federal courts have applied 28 U.S.C. § 1961(a) to determine the prejudgment interest rate, particularly where the Bankruptcy Code or other fed-

---

**23.** Section 502(d) states that:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f),

522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

eral statutes supply the substantive right. *See, e.g., Sweet v. Consol. Aluminum Corp.,* 913 F.2d 268, 270–71 (6th Cir.1990)(affirming the district court award of prejudgment interest under 28 U.S.C. § 1961(a) on a claim for pension benefits); *Lewis v. Harlin (In re Harlin),* 325 B.R. 184, 193 (Bankr.E.D.Mich.2005)(stating that "[s]ome bankruptcy courts have exercised their equitable discretion to award prejudgment interest and set the prejudgment interest rate based on 28 U.S.C.A. § 1961(a)," and citing such cases); *Floyd v. Dunson, d/b/a MMD (In re Ramirez Rodriguez),* 209 B.R. 424, 434 (Bankr.S.D.Tex.1997)(holding that the trustee, who had successfully recovered preferential and fraudulent transfers, was "entitled to recover … prejudgment interest at the statutory rate set forth in 28 U.S.C. § 1961(a)," and citing other cases awarding prejudgment interest at the statutory rate set forth in 28 U.S.C. § 1961(a)); *Wilson v. First Nat'l Bank, Lubbock, Texas (In re Missionary Baptist Found. of Am., Inc.),* 69 B.R. 536, 538–39 (Bankr.N.D.Tex.1987)(finding it logical for the bankruptcy court to apply the rate of interest in 28 U.S.C. § 1961 to both prejudgment and postjudgment interest where the Bankruptcy Code created the substantive right); *Waldschmidt, v. Ranier (In re Fulghum Constr. Corp.),* 78 B.R. 146, 153 (M.D.Tenn.1987), *rev'd on other grounds,* 872 F.2d 739 (6th Cir.1989)(finding that the bankruptcy court did not abuse its discretion in applying the rate of interest in 28 U.S.C. § 1961 to a preference action by the bankruptcy trustee).

■ In determining whether prejudgment interest is appropriate, bankruptcy courts should inquire whether such an award would serve to compensate the prevailing party and is equitable under the circumstances. *See Frymire v. Ampex Corp.,* 61 F.3d 757, 774 (10th Cir.1995); *Floyd v. Dunson, d/b/a MMD (In re Ramirez Rodriguez),* 209 B.R. 424, 434 (Bankr.S.D.Tex.1997). A prejudgment interest award is appropriate where it is necessary to fully compensate a party for the lost use of its money and to prevent the defendant's unjust enrichment. *See Sweet v. Consolidated Aluminum Corp.,* 913 F.2d 268, 270–71 (6th Cir.1990); *Vic Bernacchi & Sons, Inc. v. Loxas (In re Vic Bernacchi & Sons, Inc.),* 170 B.R. 647, 656 (Bankr.N.D.Ind.1994); *Fulghum Constr. Corp.,* 78 B.R. at 154. In *Van Dyck/Columbia Printing v. Katz,* the court stated that

"[T]he factors influencing the exercise of [the court's] discretion to [award prejudgment interest] include: (1) the need for full compensation of an injured party; (2) considerations of fairness and the relative equities of the award; (3) the remedial purpose of the statute involved, and/or (4) such other general principles as are deemed relevant by the court."

289 B.R. 304, 318 (D.Conn.2003)(quoting *United States v. Nat'l Westminster Bank USA (In re Q–C Circuits Corp.),* 231 B.R. 506, 513–14 (E.D.N.Y.1999)(citing *Wickham Contracting v. Local Union No. 3, IBEW,* 955 F.2d 831, 833 (2d Cir.1992))).

■ Federal courts have exercised broad discretion in determining the time from which prejudgment interest should accrue. "With respect to fraudulent transfers, some courts have awarded prejudgment interest beginning from the time that demand or an adversary proceeding is initiated, while others have awarded prejudgment interest from the date of the transfer." *LaSalle Nat'l Bank Ass'n v. Paloian,* 406 B.R. 299, 363 (N.D.Ill.2009) (citation omitted). However, generally, courts award prejudgment interest from the date a demand is made for the return of property or where no demand was

made, from the date an adversary complaint was filed. *Dayton Title Agency, Inc. v. White Family Cos., Inc. (In re Dayton Title Agency, Inc.),* 292 B.R. 857, 876 (Bankr.S.D.Ohio 2003) (citation omitted); *Floyd v. Dunson, d/b/a MMD (In re Ramirez Rodriguez),* 209 B.R. 424, 434 (Bankr.S.D.Tex.1997); *Pereira v. Goldberger (In re Stephen Douglas, Ltd.),* 174 B.R. 16, 22 (Bankr.E.D.N.Y.1994); *Waldschmidt, v. Ranier (In re Fulghum Constr. Corp.),* 78 B.R. 146, 153–54 (M.D.Tenn.1987), *rev'd on other grounds,* 872 F.2d 739 (6th Cir.1989).

■ Applying the concepts just discussed, the Court finds that prejudgment interest is necessary to fully compensate GTI for the lost use of its money and to prevent the Onkyo Defendants' unjust enrichment, and that fairness, equity, and the remedial purposes of the statutes involved all support an award of prejudgment interest in this case. The Court will award prejudgment interest to GTI from the date on which GTI filed this adversary proceeding forward, at the federal statutory rate under 28 U.S.C. § 1961 that was in effect when this adversary proceeding was filed. Post judgment interest will accrue on the judgment at the federal statutory rate in effect as of the date of entry of the judgment. 28 U.S.C. § 1961(a).

## V. Defendants' spoliation defense and request for sanctions

### A. Factual findings concerning alleged spoliation of evidence

#### 1. Documents maintained by OAI

As found above, in October 2001, before bankruptcy, and well before the subsequent liquidation of OAI, the day-to-day operations of OAI were taken over by GMAC and BBK, and GTI's president and CFO were removed from control of OAI and its assets and records.

GTI's Willis and Natan were not allowed by GMAC or BBK to travel to the OAI facilities where its physical assets and records were located. (R. 4/17 p. 86). Thus, despite the fact that Willis and Natan retained their official OAI titles until their formal resignations in December 2001, they had lost all control over OAI's facilities and records in October. (R. 4/17 pp. 85–86; R. 4/25 pp. 11–12; TX 144).

Also, as found above, and unbeknownst to Willis or Natan, in approximately January 2002, GMAC and its agents began the liquidation of OAI's assets, without regard to the preservation of company records. As a result, some of OAI's documents were disposed of.

Since GTI's representatives were denied access and control over OAI's physical assets, file cabinets, computers, and records, GTI did not cause the disposal of any OAI documents. Moreover, the Court notes that the true Plaintiffs in this case, while represented in this litigation by Willis as Chief Litigation Officer, are GTI's creditors, not Willis or Natan.

#### 2. Documents maintained by GTI

Before and following the filing of this litigation, GTI conducted a thorough search for all documents maintained by GTI that could be relevant to this litigation. (SR. 4/18 pp. 6–9; R. 4/18 p. 5). During this search, it became apparent that certain documents were missing from GTI's computer servers and that hard copies of certain documents were missing from Willis's personal files. (*Id.*). These documents from Willis's personal files were all located by Willis's present staff during trial, however, and were immediately produced to the Onkyo Defendants. These documents, therefore, are no longer at issue. (TX 373).

The Court finds that there has been no evidence presented that Plaintiff GTI was responsible for destroying electronic documents maintained by GTI. In addition, the Court credits the testimony of computer specialist, Glenn Nichols, that no one at GTI, including Willis and Natan, had the computer knowledge or sophistication required to manipulate GTI's electronic files in the manner Mr. Nichols discovered they had been manipulated. According to Mr. Nichols, it was entirely possible for anyone outside of GTI to have tampered with GTI's electronic information system through various vulnerable entry points. (Dep. Glenn Nichols pp. 65–69, 78–79, 82).

### 3. The missing "Budget Roll–Up"

As already found above, GTI created the GAM based, in part, on information provided by the Onkyo Defendants in the form of a Budget Roll–Up. While several pages of the Budget Roll–Up were attached to a version of the GAM and presented at trial, a significant portion of the Budget Roll–Up is missing. (TX 227).

The Court finds that the Defendants' allegation that Plaintiff GTI is responsible for destroying or losing the OAI Budget Roll–Up is contradicted by the evidence presented at trial. Natan testified that GTI was only allowed to view the Budget Roll–Up during personal meetings, and was forbidden by Shimojima, an agent of the Onkyo Defendants, from taking possession of, or copying the Budget Roll–Up. (R. 4/24 pp. 53–54; SR. 4/11 p. 87). Moreover, Natan testified that even after the OAI acquisition closed, GTI was not provided a copy of the Budget Roll–Up by Shimojima or any of the Onkyo Defendants' agents. (R. 6/19 pp. 119–20, 123).

The only testimony that GTI ever received the OAI Budget Roll–Up came from Pillow, whose testimony on this point the Court finds to lack credibility. Pillow testified that all of the documents he gave to GTI during due diligence were also given to Duff & Phelps. (R. 5/16 pp. 104–05). But there is no evidence that the OAI Budget Roll–Up was contained in Duff & Phelps' records either.

### 4. GTI's efforts to recover missing documents

Upon learning that documents may have been lost during the liquidation of OAI, Plaintiff made every effort to recover any such documents and to acquire any documents that were not. To this end, Willis paid a storage vendor to preserve documents scheduled to be destroyed for GMAC's non-payment of storage fees, personally traveled to the storage facility to review the documents, and paid to transport all relevant documents to GTI's facilities for further review and duplication. (SR. 4/18 pp. 8–9; R. 4/18 p. 5).

Furthermore, upon discovering that one of OAI's computer servers had been sold to a former employee during the liquidation, GTI hired that employee, Troy Wilson, to search the server for any and all documents that could be relevant to this litigation. (SR. 4/18 pp. 7–8). To accomplish this, GTI was required to buy a license for software that would permit the viewing of data and documents on the server. (SR. 4/18 p. 7). GTI also retained the services of Joe Kelly, an independent forensic computer consultant, to open and search e-mail files contained on a CD ROM provided to GTI by Troy Wilson. (Dep. Joseph Kelly at pp. 46–47; TX 431).

GTI also took all reasonable efforts to recover electronic documents determined to be missing from GTI's servers. GTI hired computer consultants, Joseph Kelly and Glenn Nichols, both of whom testified that they were asked to and did search GTI's computer systems for any and all documents that could be recovered. (R.

4/18 p. 5; Dep. Joseph Kelly at pp. 46–47; Dep. Glenn Nichols at pp. 26–27).

GTI provided Joseph Kelly with a backup tape that was a complete copy of GTI's computer servers and asked him to restore any and all documents contained therein. Kelly also assisted in searching the restored tape for copies of missing documents and anything else that might be relevant to this litigation. (Dep. Joseph Kelly at pp. 46–47).

Mr. Nichols performed a complete review of GTI's computer system to find any documents that appeared to be missing, hidden, deleted, or otherwise tampered with, and to assess GTI's system security. (Dep. Glenn Nichols at pp. 26–27).

### 5. Alleged prejudice to the Onkyo Defendants

The Court finds that the Onkyo Defendants have not been prejudiced by any missing evidence, and in so finding, the Court relies on the following facts: (1) both Plaintiff and the Onkyo Defendants were denied the ability to inspect the complete "Budget Roll–Up" during discovery, because it is apparently missing; (2) the "Budget Roll–Up" did not contain contracts and purchase orders to support sales forecasts; (3) the pages of the "Budget Roll–Up" that do exist, do not support the Onkyo Defendants' claim that OAI provided reasonable sales projections to GTI; (4) the expectations of the parties are evident from the several versions of the GAM that have been produced; (5) the parties have reviewed thousands of pages of documents and deposed numerous fact witnesses; and (6) the parties have each produced several expert reports and extensive expert testimony at trial, opining on, among other things, the fair market value of the OAI equity and the insolvency of GTI at the time of the OAI acquisition, and neither expert has testified to being unable to accomplish their analysis due to any missing documents.

### B. Federal law principles applicable to the Onkyo Defendants' request for relief based on spoliation

#### 1. The elements of spoliation

■ " 'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, No. 06–CV–13143, 2009 WL 998402, at * 1 (E.D. Mich. April 14, 2009)(quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)). In cases filed in federal court, federal law governs the rules that apply to, and the range of sanctions a federal court may impose for, the spoliation of evidence. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir.2009)(en banc)(overruling prior Sixth Circuit cases holding that state law governs spoliation sanctions in federal courts).

■ A party seeking sanctions for the spoliation of evidence has the burden of proving

that the spoliating party (1) had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) acted with a culpable state of mind [in] destroying or losing the evidence; and that (3) the missing evidence is relevant to the innocent party's claim or defense.

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F.Supp.2d 456, 467 (S.D.N.Y.2010)(citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.2002)).

#### 2. Sanctions for spoliation

■ Federal courts have broad discretion in fashioning appropriate sanctions for the spoliation of evidence. *Adkins*, 554

F.3d at 652. Proper spoliation sanctions should promote two goals: (1) fairness (*i.e.,* "leveling the evidentiary playing field"); and (2) punishment to deter such improper conduct in the future, and to "plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk." *See id.* (citing *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir. 1995)).

 The seriousness of the sanction to be imposed depends upon consideration of the following:

> (1) the degree of fault of the party who altered or destroyed [or lost] the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Donohoe v. Am. Isuzu Motors, Inc.,* 155 F.R.D. 515, 519 (M.D.Pa.1994)(quoting *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994)). "Because failures to produce relevant evidence fall 'along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality,' the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." *Adkins,* 554 F.3d at 652–53 (quoting *Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988), *overruled on other grounds by Adkins,* 554 F.3d at 652). Sanctions a court may impose include dismissal of a case, granting summary judgment, and instructing a jury that it may make an adverse inference against the spoliating party based on its spoliation of the evidence. *Id.* at 653. In a case tried to the court rather than a jury, the sanctions may include the court's drawing such an adverse inference. Other possible sanc-

tions include monetary sanctions and precluding the spoliating party from introducing evidence on the subject matter of the spoliated evidence. *See Pension Comm.,* 685 F.Supp.2d at 469; *Lexington Ins. Co. v. Tubbs,* No. 06–2847–STA, 2009 WL 1586862, at *3 (W.D.Tenn. June 3, 2009).

**a. Sanctions that terminate the litigation**

 The granting of judgment in favor of a party that has been prejudiced by the spoliation of relevant evidence is a drastic sanction, and should be reserved only for those cases where " 'there is a showing of willfulness, bad faith, or fault on the party of the sanctioned party.' " *BancorpSouth Bank v. Herter,* 643 F.Supp.2d 1041, 1060 (W.D.Tenn.2009); *see also Tubbs,* 2009 WL 1586862, at *3. Granting judgment against a party is a sanction of "last resort" which should be imposed only in extreme circumstances where an alternative, less drastic sanction or set of sanctions are insufficient to both cure any prejudice suffered as a result of the spoliation, and to punish such conduct. *See Tubbs,* 2009 WL 1586862, at *3 (citing *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)); *Wade v. Tiffin Motorhomes, Inc.,* 686 F.Supp.2d 174, 196 (N.D.N.Y.2009); *see also Pension Comm.,* 685 F.Supp.2d at 469 ("It is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy [for the spoliation of evidence.]").

**b. Sanctions in the form of an adverse inference, a presumption, and shifting burdens of production and persuasion**

 Instructing a jury that, based on the spoliation of evidence, it may or must draw an adverse inference, or making a presumption against the spoliating party about a fact in dispute, is a less

drastic spoliation sanction than the "terminating sanctions," which a federal court may be impose. *Pension Comm.*, 685 F.Supp.2d at 469. The same principles apply to the court in a case tried to the court rather than to a jury.

> "[W]here one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court should draw the strongest allowable inferences in favor of the aggrieved party." *National Ass'n of Radiation Survivors [v. Turnage]*, 115 F.R.D. [543,] 557 [N.D. Cal.1987]. The strength of the inference allowable obviously will vary according to the facts and evidentiary posture of a given case. Whether the defendant's actions may result or must result in an inference that the missing evidence would be unfavorable to the spoliator, or result merely in a burden-shifting presumption, will depend upon a case by case analysis.

*Welsh v. United States*, 844 F.2d 1239, 1247 (6th Cir.1988), *overruled on other grounds by Adkins*, 554 F.3d at 652 (internal quotation marks and citations omitted).

#### c. Monetary sanctions

 Monetary sanctions are appropriate to punish the offending party for its actions [and] to deter the litigant's conduct, sending the message that egregious conduct will not be tolerated. Awarding monetary sanctions serves the remedial purpose of compensating [the movant] for the reasonable costs it incurred in bringing [a motion for sanctions].

*Pension Comm.*, 685 F.Supp.2d at 471 (internal quotation marks and citation omitted).

### 3. Case law concerning the elements of spoliation

#### a. The duty to preserve evidence

 The standards of conduct regarding the duty to preserve evidence have evolved in recent years. Today's standards were not so clearly established during the relevant time period in this case (2001–2004). *See, e.g., Pension Comm.*, 685 F.Supp.2d at 471 (noting the importance in this regard of the July 2004 decision in *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y.2004)). Today, at least, it is "well established that the duty to preserve evidence arises when a party reasonably anticipates litigation. [O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Pension Comm.*, 685 F.Supp.2d at 466 (internal quotation marks and citations omitted).

#### b. Culpable state of mind

 To satisfy the "culpable state of mind" requirement for spoliation sanctions, the innocent party must show that the spoliating party lost or destroyed evidence as a result of (1) bad faith (*i.e.*, intentional or willful) destruction, (2) gross negligence, or (3) ordinary negligence. *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, 2009 WL 998402, at *5 (E.D.Mich.2009)(citing *Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 179 (D.Md.2008)).

In 1988 in the *Welsh* case, the Sixth Circuit described one circumstance—an extreme situation not present in this case—under which it is appropriate for a court to impose a rebuttable inference or presumption against a spoliating party, even where the loss or destruction of evidence was due only to ordinary negligence:

> When, as here, a plaintiff is unable to prove an essential element of her case due to the negligent loss or destruction of evidence by an opposing party, and

the proof would otherwise be sufficient to survive a directed verdict, it is proper for the trial court to create a rebuttable presumption that establishes the missing elements of the plaintiff's case that could only have been proved by the availability of the missing evidence. The burden thus shifts to the defendant-spoliator to rebut the presumption and disprove the inferred element of plaintiff's prima facie case.

*Welsh,* 844 F.2d at 1248. In *Welsh,* the Sixth Circuit was applying the law of Kentucky, but because there was "no Kentucky case dealing with the pre-litigation disposal of ultimately critical evidence by a negligent defendant[,]" it arrived at this conclusion by applying the "venerable [spoliation inference] principle" established in the 18th century English case of *Armory v. Delamirie,* 1 Strange 505, 98 Eng. Rep. 664 (K.B.1772), to "20th century evidentiary principles." *Id.* at 1246. This suggests that Welsh applies under the federal law of spoliation as well.

In *Forest Laboratories,* the district court explained the rationale for permitting an adverse inference to be drawn from even a merely negligent loss or destruction of evidence:

"[The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than fa-

vorable should fall on the party responsible for its loss."

*Forest Labs.,* 2009 WL 998402, at *5 (quoting *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 75 (S.D.N.Y.1991)).

But Sixth Circuit cases decided after the 1988 *Welsh* case appear to hold that under federal law, ordinary negligence is not enough to impose an adverse-inference sanction for spoliation. These cases appear to require a finding of intent, or at least something more than ordinary negligence, to impose an adverse inference. Some of the cases even incorporate the intent element into the definition of "spoliation."

In *Tucker v. General Motors Corp.,* 945 F.2d 405, 1991 WL 193458, at *2 (6th Cir. Sept 30, 1991)(unpublished table decision), the Sixth Circuit required a showing of bad faith to justify an adverse inference:

We have recognized that spoliation of evidence occurs along a "continuum of fault," from innocence through the varying degrees of negligence to intentional destruction. Likewise, a host of penalties may accompany the types of behavior manifested through this continuum. *Welsh v. United States,* 844 F.2d 1239, 1245–47 (6th Cir.1988). **In general, a court may not allow an inference that a party destroyed evidence that is in its control, unless the party did so in bad faith.** *See, e.g., Eaton Corp. v. Appliance Valves Corp.,* 790 F.2d 874, 878 (Fed.Cir.1986) (two conditions precedent are destruction of evidence and bad faith); *Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir.1985); *S.C. Johnson & Son v. Louisville & Nashville Railroad Co.,* 695 F.2d 253, 258–59 (7th Cir.1982); *Valentino v. United States Postal Service,* 674 F.2d 56, 73 n. 31 (D.C.Cir.1982); and *Vick v. Texas Employment Commission,* 514 F.2d 734, 737 (5th Cir.1975) (bad faith,

not merely negligence, must be manifested under the circumstances).

(Emphasis added). Because the court found no evidence of bad faith on the part of the defendant, it affirmed the district court, which had "refused to allow the jury to draw an inference adverse to the defendant" where "insufficient evidence existed to show that intentional spoliation occurred." *Id.* at *2–3.

In *Beck v. Haik*, 377 F.3d 624, 641 (6th Cir.2004), *overruled on other grounds by Adkins*, 554 F.3d at 652, the Sixth Circuit defined "spoliation" as "the **intentional** destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *Id.* (emphasis added); *see also Chrysler Realty Co., LLC, v. Design Forum Architects, Inc.*, 341 Fed. Appx. 93, 95 (6th Cir.2009) (unpublished) (recognizing that under *Adkins* federal law controls spoliation sanctions, and stating that "[w]hen a party is found to have **deliberately** destroyed evidence that is important to the opposing party's ability to present a claim or defend itself from a claim, the court has the discretion to impose sanctions on the spoliating party")(emphasis added; quoting *Beck v. Haik*, 377 F.3d 624, 641 (6th Cir.2004), *overruled on other grounds* by *Adkins v. Wolever*, 554 F.3d 650 (6th Cir.2009)).

A recent district court case from within the Sixth Circuit also required more than ordinary negligence for an adverse inference. *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, No. 2:03–md–1565, 2009 WL 2169174, at *3 (S.D.Ohio July 16, 2009), held that "[g]enerally, a court will not impose an adverse inference with respect to destroyed evidence, unless the party did so in bad faith." The court cited with approval cases which held that a finding of bad faith and not mere negligence is required, and contrasted those cases with *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir.2002) ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence[.]"). *Id.*

■ The Court concludes that it is bound by Sixth Circuit case law to require bad faith on the part of a spoliator, rather than mere negligence, before imposing an adverse inference. The Court therefore declines to follow the standard for imposing an adverse inference set forth in *Forest Laboratories*, a recent district court case from this district. In *Forest Laboratories*, the court held, based in part on *Residential Funding*, that under some circumstances, ordinary negligence is sufficient culpability to impose an adverse inference, and that intentional or bad faith destruction of evidence is not necessary. *Forest Labs.*, 2009 WL 998402, at *5–6.

### c. Relevance

■ Evidence is relevant if it "would naturally have been introduced into evidence" at trial and "naturally would have elucidated a fact at issue." *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995). Where a party "has notice of an item's possible relevance to litigation" and yet "proceeds nonetheless to destroy it[,]" " '[t]he fact of destruction satisfies the minimum requirement of relevance [under Fed.R.Evid. 401[.]]' " *Welsh*, 844 F.2d at 1246 (quoting *Nation–Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir.1982)).

### C. Neither the dismissal of claims nor any other sanction is appropriate for any alleged spoliation of evidence in this case

■ The Onkyo Defendants have not shown that Plaintiff GTI is responsible for any missing documents or electronic records of OAI or GTI, or that GTI acted

with a "culpable state of mind" in destroying, losing, or failing to preserve any documents or other evidence. No negligence, gross negligence, or bad faith by GTI has been shown.

Regarding OAI's missing documents, any missing documents are the result of: (1) the Onkyo Defendants' own failure to provide those documents to GTI and OAI (*i.e.*, the Budget Roll–Up); (2) the request by Shimojima (an agent of the Onkyo Defendants) that his own e-mails and documents be destroyed when he left OAI in 2001 (Dep. Troy Wilson at pp. 87–88); and (3) GMAC's failure to maintain adequate safeguards to preserve documentary evidence during asset liquidation. The creditors on whose behalf GTI's claims have been asserted should not be penalized for the actions of these parties which resulted in the displacement of documentary evidence.

Regarding missing GTI documents, the Onkyo Defendants failed to present any evidence showing that GTI was responsible for destroying or losing anything. The evidence shows only that GTI's computer system may have been tampered with by someone with access to the company's virtual private network. As Will Willis's paper files were discovered and produced during trial, these documents are no longer at issue for purposes of the Onkyo Defendants' spoliation allegations.

The Court further finds that the Onkyo Defendants have failed to prove that they were prejudiced by the loss or destruction of any OAI or GTI documents or electronic records.

The Court concludes that neither dismissal of the fraudulent conveyance claims nor any other relief (including monetary sanctions) is appropriate for any alleged spoliation of evidence.[24]

## VI. Defendants' stated defenses of laches, estoppel, and unclean hands

Defendants have asserted the defenses of laches, estoppel, and unclean hands. Each of these defenses, as argued by the Onkyo Defendants, is based on Onkyo Defendants' spoliation argument—*i.e.*, the Onkyo Defendants' allegations that GTI failed to maintain company records or destroyed documents before filing this adversary proceeding.

The Court rejects these defenses as unsupported, for the same reasons the Court has rejected the spoliation defense.

■■■■■ With respect to the laches defense, the Court notes the following additional points. Although under Florida law, laches generally is not a defense to an action brought within the applicable statute of limitations, "[a]n exception to this rule applies when the equities of the situation demand that enforcement be barred. This occurs when an unreasonable delay results in prejudice to the rights of the party against whom enforcement of a debt or other obligation is sought." *Briggs v. Estate of Geelhoed,* 543 So.2d 332, 333 (Fla.Dist.Ct.App.1989). *See also Appalachian, Inc. v. Olson,* 468 So.2d 266, 269 (Fla.Dist.Ct.App.1985) ("Laches may be applied before the statute of limitations expires only where strong equities appear. Laches is based upon an unreasonable de-

---

**24.** In addition, the Court now makes final and unconditional all of the conditional evidentiary rulings that it made during trial, which include conditional rulings overruling the Onkyo Defendants' objections based on Fed. R.Evid. 1002 and 1004(1). In this regard, the Court finds that none of the documents pertinent to Onkyo Defendants' Rule 1002/1004(1) objections were lost or destroyed by Plaintiff GTI "in bad faith" within the meaning of Fed.R.Evid. 1004(1).

lay, in asserting a known right which causes undue prejudice to the party against whom the claim is asserted.") (citations omitted). "[L]aches is an affirmative defense, and the burden of proof is on the party asserting it; it must, moreover, be proved by very clear and positive evidence." *Smith v. Branch*, 391 So.2d 797, 798 (Fla.Dist.Ct.App.1980) (citations omitted).

▮▮▮ The Onkyo Defendants admit that GTI' fraudulent transfer claims were brought within the applicable four-year statute of limitations. But they argue that because documents critical to their defense were destroyed before the adversary complaint was filed, GTI's delay in filing the action caused the Onkyo Defendants undue prejudice, so the action is barred by laches.

The Court concludes that for the same reasons that dismissal is not appropriate based on the spoilation of evidence, laches does not bar GTI's claims. This is particularly true here because GTI filed suit well before the statute of limitations expired, and the Onkyo Defendants were aware for almost two years before suit was filed of the possibility of litigation. The Onkyo Defendants have not proven that GTI is guilty of "unreasonable delay" in filing this adversary proceeding, or that the Onkyo Defendants were prejudiced by an such delay.

## VII. Conclusion

Based on the findings of fact, conclusions of law, and the reasons stated in this opinion, the Court today will enter judgment, by separate document, as follows:

(1) denying the Onkyo Defendants' motion for judgment under Fed.R.Civ.P. 52(c), applicable by Fed.R.Bankr.P. 7052, which the Onkyo Defendants made and renewed during trial;

(2) denying the Onkyo Defendants' renewed motion for relief based on Plaintiffs' alleged spoliation of evidence;

(3) on Count I of the First Amended Complaint, judgment in favor of Plaintiff GTI and against the Onkyo Defendants, jointly and severally:

(a) avoiding Plaintiff GTI's payment of $13 million to the Onkyo Defendants on August 31, 2000, subject to a credit for the Onkyo Defendants' "good faith transferee" defense under Florida law as described in this opinion and as reflected in subparagraph (3)(c) below;

(b) avoiding GTI's obligations to the Onkyo Defendants under the three promissory notes that GTI made, dated August 31, 2000, and

(c) judgment in favor of Plaintiff GTI and against the Onkyo Defendants, jointly and severally, in the amount of $6.1 million, plus interest from the date on which GTI filed this adversary proceeding forward, at the federal statutory rate under 28 U.S.C. § 1961 that was in effect when this adversary proceeding was filed; plus post judgment interest at the federal statutory rate in effect as of the date of entry of the judgment under 28 U.S.C. § 1961(a); plus costs; and

(4) on Count VI of the First Amended Complaint, disallowing the claims filed by each of the Onkyo Defendants in the GTI bankruptcy case, under 11 U.S.C. § 502(d), unless and until the full amount of the judgment on Count I is paid; and

(5) dismissing, as moot, Count II of the First Amended Complaint.

Because all other claims in the First Amended Complaint were disposed of previously, entry of the judgment just described will terminate this adversary proceeding.